**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IOANE JOHN OPETA,

*Plaintiff-Appellant,*

v.

NORTHWEST AIRLINES PENSION
PLAN FOR CONTRACT EMPLOYEES,

*Defendant-Appellee.*

No. 04-56719

D.C. No.
CV-03-05189-WJR

OPINION

Appeal from the United States District Court
for the Central District of California
William J. Rea, District Judge, Presiding

Argued and Submitted
September 12, 2006—Pasadena, California

Filed May 7, 2007

Before: J. Clifford Wallace, M. Margaret McKeown, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Lisa S. Kantor, Glenn R. Kantor, Kantor & Kantor LLP, Northridge, California; Russell G. Petti, Law Offices of Russell G. Petti, La Canada, California, for the plaintiff-appellant.

Thomas B. Ackland, Jason Orlandi, Barger & Wolen LLP, Los Angeles, California, for the defendant-appellee.

**OPINION**

WARDLAW, Circuit Judge:

Ioane John Opeta appeals the district court's judgment that he is not "totally and permanently" disabled, and therefore ineligible for a disability pension benefit under the Northwest

Airlines Pension Plan for Contract Employees (the "Plan"), which is administered by Northwest Airlines ("Northwest") and regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"). We must determine whether the district court, in conducting a de novo review of the Plan's denial of benefits, abused its discretion by admitting evidence extrinsic to the administrative record. We hold that because the circumstances did not clearly establish that the evidence was necessary to the district court's review, *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110-11 (9th Cir. 1999), the district court abused its discretion by admitting the evidence. Therefore, we reverse the district court's judgment and remand for a grant of benefits under the Plan.

I.

On October 30, 1996, Ioane John Opeta, a Northwest employee, severely injured his back when he grabbed a falling 300-pound crate while loading cargo onto an aircraft. Opeta underwent surgery and received extensive treatment for his injury, including physical therapy, and numerous epidurals for pain relief. In 1998, Opeta returned to work for Northwest as a ramp coordinator on light duty, but was terminated from his position as equipment lead supervisor because of his medical condition. He proceeded to work at Northwest in various positions, including as an accountant, a security coordinator, and an inspector of security and pollution processes at several Northwest facilities. Opeta remained in constant pain that was exacerbated by long periods of sitting or standing.

In 2001, Opeta's condition worsened and he began experiencing sharp pain in his lower back. Medical tests revealed that he had mild degenerative disc disease in his spine. Dr. Mealer, the orthopedic surgeon to whom Opeta had been referred by Northwest, and who performed Opeta's surgery, reported that Opeta was temporarily totally disabled, but nevertheless cleared him for work. In 2002, on Dr. Mealer's rec-

ommendation, Opeta was placed on leave due to total disability.

On February 5, 2002, Opeta applied for a disability retirement pension. Under the Plan's terms, an employee may receive a disability retirement pension if the participant's "employment ends due to [his] total and permanent disability." The Plan defines total and permanent disability as "a medically determinable physical or mental condition which renders you incapable of any employment with [Northwest]." The Plan provides that Northwest will determine whether the employee is totally and permanently disabled based on the employee's medical reports. If the employee disagrees with Northwest's decision, a doctor acceptable to both the employee and Northwest will make a "final and binding" determination following an Independent Medical Examination ("IME"). After the Plan's in-house physician reviewed the medical records, he concluded that while Opeta was totally disabled, he was not permanently disabled from all employment with Northwest. Opeta disagreed with the denial of his application, and pursuant to the Plan, exercised his right to an IME.

Northwest and Opeta agreed that Dr. Gold, an orthopedic specialist, would perform the IME and make the "final and binding" determination. On November 4, 2002, Dr. Gold examined Opeta and determined that Opeta was "temporarily totally disabled" and "unable to work in any capacity." Dr. Gold reported that while there was "a possibility that [Opeta] could be a candidate for extreme sedentary work," it was "very unlikely."

Northwest requested that Dr. Gold clarify his determination by answering a specific set of written questions about Opeta's condition. Dr. Gold responded as follows:

> Question 1:    Was John Opeta totally disabled from all employment with Northwest Airlines on May 3, 2002?

Answer:         Yes, Mr. Ioane John Opeta was totally disabled from all employment with Northwest Airlines on 05-03-02.

Question 2:     Was John Opeta permanently disabled from all employment with Northwest Airlines on May 3, 2002?

Answer:         Yes, Mr. Ioane John Opeta was permanently disabled from all employment with Northwest Airlines on 05-03-02.

Question 3:     On what date was John Opeta both totally & permanently disabled from all employment (including light or sedentary work without regard to level of pay)? If John Opeta was not both totally & permanently disabled from all employment, please explain your reasons for your opinion.

Answer:         Mr. Opeta has been totally and permanent [sic] disabled from all employment since January 2002 as a result of his chronic lumbar condition status post a lumbar L4-5 decompression and chronic bilateral radiculopathy and chronic back pain syndrome.

Question 4:     Is there any type of work that John Opeta could do? If "yes", please describe.

Answer:         At this time, there is no type of work that Mr. Opeta could participate in

as noted previously. The possibility of extreme sedentary type of work could be a possibility after further time and appropriate treatment.

Question 5:    Is there any treatment currently available that would allow John Opeta to return to some kind of employment? If yes, please describe the type of treatment and the frequency and duration of care you believe is indicated.

Answer:    With further time and back rehabilitation, there is a remote possibility that Mr. Opeta could return to some kind of employment and, as described above, this would be extremely sedentary. The treatment that could potentially render Mr. Opeta to achieve this position could be further back rehabilitation program, epidural steroid injections, or a possibility of lumbar fusion.

On January 16, 2003, Northwest again denied Opeta's claim for benefits, basing its denial on "the evaluation by Dr. Gold, and other evidence," also reiterating that Dr. Gold's decision was "final and binding."

Opeta subsequently filed an action in the United States District Court for the Central District of California, seeking an award of benefits under the Plan.[1] The district court held a

---

[1]Opeta misguidedly contends that the Plan contains an "arbitration agreement" which the district court should have enforced. Opeta's argument relies on a distorted reading of the Plan's terms. The Plan itself contains no language suggesting that any dispute between a beneficiary and

bench trial to determine, on de novo review, whether Opeta was totally and permanently disabled within the meaning of the Plan. During opening statements, over Opeta's objection, the district court allowed Northwest to read a textual description of a previously undisclosed surveillance videotape of Opeta filmed in September 2002—two months before Dr. Gold examined Opeta. Although the videotape itself never became a part of the administrative record, Northwest possessed a textual description of the video's contents and still shots for over a month before Dr. Gold's examination. Northwest did not, however, submit this evidence to Dr. Gold to be considered in his independent evaluation of Opeta's condition.

The videotape depicted Opeta doing yard work for approximately two hours and thirty minutes in front of his house, including using an electric hedge trimmer to cut the bushes, a gas-powered weed trimmer to edge the lawn, and a lawn mower to cut the grass. It also showed Opeta using a broom and dust pan with an extended handle to sweep, as well as a hose to water the lawn. While he was performing these activities, Opeta used back support, which he wore strapped around his waist and over his shoulders.

After the first day of proceedings, the district judge ordered Dr. Gold and Opeta into court to testify. Dr. Gold testified that it was "very unlikely" that Opeta could return to work and that he was "totally disabled from any employment at Northwest Airlines." Dr. Gold also stated that "based on the information that I had then and based on what I still have right

---

Northwest must be arbitrated. Opeta, however, suggests that the Plan's language providing for an independent medical opinion, with respect to the determination of total and permanent disability, is in essence an agreement to arbitrate. We disagree and focus instead on the crux of Opeta's argument, which is that the district court should have excluded new evidence and enforced Dr. Gold's "final and binding" determination according to the terms of the Plan.

now, I would stick to that conclusion." However, on cross-examination Northwest surprised Dr. Gold by playing the videotape. Dr. Gold then testified that if he had been provided with the videotape at the time of his November 2002 evaluation, he would not have concluded that Opeta was totally and permanently disabled.

The district court also allowed Dr. Mealer to testify regarding Opeta's medical condition and treatment, as well as his impressions of the videotape surveillance which he had previously viewed as part of his review of Opeta's claim. Additionally, the district court ordered the videographer to testify as to what he observed while conducting the video surveillance of Opeta.

The district court's judgment found that Opeta was not totally and permanently disabled within the meaning of the Plan and thus, not eligible for disability retirement benefits.

## II.

In ERISA cases, we review de novo the district court's choice and application of the appropriate standard of review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc). We review the district court's decision to admit or exclude evidence that was not before the plan administrator for an abuse of discretion. *See Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 985 (9th Cir. 2001); *Friedrich*, 181 F.3d at 1110-11. We review for clear error underlying findings of fact. *Friedrich*, 181 F.3d at 1109.

## III.

The district court correctly ruled that the appropriate standard for review of the Plan's denial of benefits is de novo. The district court reviews a challenge to an ERISA plan's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). We have held that the default standard of review in ERISA cases is de novo and that discretion exists only if it is " 'unambiguously retained.' " *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc) (quoting *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th Cir. 1992)).

   **[1]** "We have held that ERISA plans are insufficient to confer discretionary authority on the administrator when they do not grant any power to construe the terms of the plan." *Abatie*, 458 F.3d at 964. In *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1112-13 (9th Cir. 2001), we concluded that even though the plan identified the carrier as "solely . . . responsible" for providing benefits, deciding all claims, and controlling the operation and administration of the plan, "those provisions merely identified the plan administrator's tasks, but bestowed no power to interpret the plan," *Abatie*, 458 F.3d at 964, and therefore de novo review was appropriate.

   **[2]** Here, the Plan nowhere states that the plan administrator, Northwest, has the full or sole discretion to interpret the terms of the plan. By its terms, the final decision as to eligibility is made not by Northwest, but by an independent mutually acceptable physician. *Cf. Abatie*, 458 F.3d at 965 (concluding that a plan conferred discretion because plan administrator had exclusive "responsibility to interpret the terms of the plan *and* to determine eligibility of benefits"); *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002) (concluding that a plan conferred discretion because its terms granted the administrator the "power" and "duty" to "interpret the plan" and to "decide on questions concerning the plan and the eligibility of any Employee" (internal quotation marks and citations omitted)); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1107 (9th Cir. 2000) (holding that a plan conferred sufficient discretion because "the Plan Administrator has the sole discretion to interpret the terms of the

Plan") (internal quotation marks omitted); *Friedrich*, 181 F.3d at 1110 n.5 (finding that administrator had discretionary authority because plan stated that insurer "shall have the sole discretion to interpret the terms of the Plan and to determine eligibility for benefits") (internal quotation marks omitted). Therefore, because the Plan did not unambiguously confer discretion on Northwest to interpret the terms of the Plan and determine eligibility benefits, the district court correctly determined that it should apply a de novo standard of review. *See Abatie*, 458 F.3d at 964.

## IV.

**[3]** While de novo is the correct standard of review in this case, the district court abused its discretion by failing to conduct the proper analysis before admitting extrinsic evidence. If de novo review applies, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie*, 458 F.3d at 963. Under de novo review, the district court should have determined whether Opeta was entitled to benefits based on the evidence in the administrative record and "other evidence as might be admissible under the restrictive rule of *Mongeluzo*." *Kearney*, 175 F.3d at 1094.

**[4]** In *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, we resolved the question of the scope of review that a district court may employ upon de novo review of a plan administrator's decision. 46 F.3d 938, 943-44 (9th Cir. 1995). Agreeing with the Third, Fourth, Seventh, Eighth, and Eleventh Circuits, we held that extrinsic evidence could be considered only under certain limited circumstances. *Id.* We cited with approval the rule of the Fourth Circuit that the district court should exercise its discretion to consider evidence outside of the administrative record " '*only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision.' " *Id.* at 944 (quoting *Quesinberry v. Life Ins. Co. of N.*

*Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)) (emphasis added). We emphasized that "a district court should not take additional evidence merely because someone at a later time comes up with new evidence" and that "[i]n most cases" only the evidence that was before the plan administrator at the time of determination should be considered. *Id.*

In *Quesinberry*, the Fourth Circuit provided a non-exhaustive list of exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

987 F.2d at 1027 (holding that the district court's admission of additional evidence was not an abuse of discretion because the extrinsic evidence was necessary to assist in the understanding of complex medical issues).

In *Friedrich*, we applied the *Mongeluzo* standard and held that the district court's admission of additional evidence was not an abuse of discretion. 181 F.3d at 1111. There, the district court correctly determined that the plan administrator had prevented the plaintiff from providing medical records to support his claim during its review and the administrative record included only incomplete, illegible, and disorganized medical

records. *Id.* We concluded that the district court did not abuse its discretion because "[w]ith the addition of [the plaintiff's] trial evidence to [the defendant's] evidence already in the administrative record, the district court had a complete record that allowed the court to make an adequate, independent de novo review of the benefits decision." *Id.* Moreover, we found that the district court properly excluded additional evidence presented by the plan administrator, because detailed, written reports from the plan's experts already in the administrative record, "made it unnecessary for the district court to hear additional testimony from [the defendant's] consultants." *Id.*

Here, the district court admitted several pieces of extrinsic evidence, including the videotape, and testimony from Dr. Gold, Dr. Mealer, Opeta, and the videographer, without conducting the proper analysis. Under *Mongeluzo*, we must determine whether each piece of extrinsic evidence was necessary for the district court to conduct an adequate de novo review. Because we conclude that none of the extrinsic evidence was necessary to conduct an adequate de novo review, we hold that the district court abused its discretion in admitting the evidence.[2]

---

[2]Northwest argues that Opeta waived his right to challenge the admissibility of the evidence. The record demonstrates otherwise. Opeta repeatedly objected to the introduction of evidence outside of the administrative record, and never waived this objection. On the first day of proceedings, Opeta's counsel objected to the district court's decision to bring Dr. Gold into court. Opeta's counsel attempted to explain to the district court the correct analysis it should apply in ERISA cases to determine whether to admit extrinsic evidence given a de novo standard of review:

> Counsel:  I said you could order it . . . . I don't think you should do it either. I think you should apply the answers to the questions as the plan says. Theoretically, in this case I have no objection to bringing in Dr. Gold. I firmly believe he will support our position; however, to do that turns Ninth Circuit law, actually Supreme Court rulings on its head with regard to ERISA, that the Court is supposed to take the administrative record and rule.

## A.

The Plan states that "[i]f you disagree with the decision of the Employer, a doctor acceptable to you and to the Employer

---

| | |
|---|---|
| The Court: | Don't I have any right to witnesses? |
| Counsel: | Your Honor, under your discretion, if you determine you need to hear a witness in order to rule — |
| The Court: | I think there is a big question here about what Dr. Gold said, what he meant by what he said. I would like him here. |
| Counsel: | If that is what the Court wants, we have no objection. |
| . . . | |
| Counsel: | We are then turning what the Courts have said is supposed to be an expeditious, expedited, efficient ERISA trial into a federal case. |
| The Court: | I've never heard of a trial that had no witnesses, have you? |
| Counsel: | Yes, your Honor. I have been doing them for years under ERISA. The Kearny case is very specific about — well, I guess its not very specific, but it's instructive that the Court is supposed to look at the administrative record to make a ruling. |
| The Court: | Well, I would feel much better if Dr. Gold was here. |
| Counsel: | Okay. |
| . . . | |
| Counsel: | Your Honor, all I can tell you is if the Court determines that there is a de novo review and the Court wishes additional evidence, the Court can order it. |
| The Court: | I'm going to order Dr. Gold and Mr. Opeta into court. |
| Counsel: | Fine. |

Opeta then filed a set of written objections to Dr. Gold's testimony and the introduction of the videotape and, on the second day of trial, before any witnesses were called, Opeta's counsel again objected to the admission of new evidence.

will make a determination. This determination will be final and binding on you and on the Employer." Both parties agree that Dr. Gold's determination was final and binding. However, Northwest asserts that Dr. Gold found Opeta to be totally, but not permanently disabled. Conversely, Opeta claims that Dr. Gold unambiguously found that Opeta was both totally and permanently disabled.

[5] De novo review requires the district court to evaluate whether Northwest correctly denied Opeta benefits under the terms of the Plan. *Abatie*, 458 F.3d at 963. The videotape of Opeta doing light yard work almost two months before Dr. Gold's evaluation was not part of the administrative record, and is not relevant to the district court's review of Northwest's interpretation of Dr. Gold's assessment. The videotape itself was never part of Dr. Gold's evaluation. The administrative record contained still frames from the videotape and textual descriptions of the surveillance, but Northwest never submitted any of these materials to Dr. Gold in connection with his "final and binding" determination, electing instead to surprise him at trial. Dr. Gold's initial determination was based entirely on Opeta's medical records supplied by both parties, as well as Dr. Gold's own personal examination. Northwest failed to place all of the records and evidence in its possession before Dr. Gold. Moreover, none of the exceptional circumstances outlined in *Quesinberry* apply here. *See* 987 F.2d at 1027. Therefore, allowing the videotape into evidence was an abuse of discretion.

### B.

[6] The district court also abused its discretion by admitting the testimony of Dr. Gold, Dr. Mealer, Opeta, and the videographer because the circumstances did not establish that the additional evidence was necessary for the court to conduct an adequate de novo review. Even if there was confusion surrounding Dr. Gold's initial assessment, Northwest took the appropriate steps to clarify that determination by requesting

that Dr. Gold answer a set of written questions that specifically asked whether Opeta was totally and permanently disabled. Dr. Gold's answers unequivocally state that he found Opeta both totally and permanently disabled at the time of the assessment. Dr. Gold's testimony was not necessary to understand or clarify his conclusions that were plainly stated in response to Northwest's follow-up questions.

Under *Mongeluzo*, that the district judge "would feel much better" if Dr. Gold testified and that he "had never heard of a trial [without] witnesses" is insufficient to warrant additional evidence. There was no "big question" or ambiguity as to what Dr. Gold meant by what he said—the administrative record contained his explanation of what he meant, as well as his conclusion that there was a remote possibility at some point in the future that Opeta could return to extremely sedentary work. Dr. Gold was clear and emphatic in those responses that Opeta was "totally and permanent [sic] disabled from all employment since January 2002" and that "[a]t this time, there is no type of work that Mr. Opeta could participate in . . ." Moreover, Northwest's insistence that Dr. Gold be called to testify seems to have been entirely for the purpose of sandbagging him with the secret videotape surveillance, as all of his testimony on direct examination was cumulative of the detailed answers he had previously supplied to Northwest.

**[7]** The additional testimony by Dr. Mealer, Opeta, and the videographer was irrelevant to determining whether the Plan correctly or incorrectly denied benefits based on Dr. Gold's evaluation, which was the only question properly before the district court.

## C.

Northwest further argues that Dr. Gold determined that Opeta was not permanently disabled because he stated that there was a possibility that Opeta's condition might improve one day to the point where he could return to "extremely sed-

entary" work, even though that possibility was "remote" and "very unlikely." Northwest contends that this "remote" possibility renders Opeta not permanently disabled, justifying its denial of Opeta's claim.

We do not interpret the terms of the Plan to require Opeta to prove that there is absolutely no chance of any type of recovery. Instead, we construe the Plan, consistent with its plain language, as requiring Opeta to be totally and permanently disabled as determined by an independent doctor at the time of his medical evaluation. The Plan states that "Total and Permanent Disability is a medically determinable physical or mental condition which renders you incapable of any employment with the Employer." *Black's Law Dictionary* defines "permanent disability" as "[a] disability that will indefinitely prevent a worker from performing some or all of the duties that he or she could do before an accident." Black's Law Dictionary 474 (7th ed. 1999). Dr. Gold stated in his second letter to Northwest that Opeta is "unable to work in any capacity, whatsoever, with Northwest Airlines" and that "[w]ith further time and back rehabilitation, there is a remote possibility that Mr. Opeta could return to some kind of employment, and [that] this would be extremely sedentary." Construing the term "permanent" to require the claimant to establish with certainty that he would never recover is unreasonable, and we will not read into the Plan an unreasonable term.

[8] Northwest also argues that after Dr. Gold submitted his evaluation, "the Plan exercised its discretion to review these reports and interpreted them to conclude that Opeta did not satisfy the definition as set forth in the Plan language." We reject this argument. According to the plain language of the Plan, Northwest no longer had discretion to interpret Dr. Gold's reports because the decision of the independent doctor was "final and binding" on both Northwest and Opeta.

V.

**[9]** We hold that admitting the videotape and additional testimony was an abuse of discretion and that, based on the plain terms of the Plan and binding nature of Dr. Gold's pretrial opinion, the district court erred as a matter of law by awarding a judgment in Northwest's favor. We therefore reverse the district court's judgment and remand for an award of benefits under the Plan consistent with this opinion.[3]

REVERSED and REMANDED.

---

[3]Opeta asks us to take judicial notice of the fact that the same district court judge in a separate subsequent case for Opeta's long term disability benefits, found that Opeta was totally disabled, and therefore, could not have possibly found that he was not totally disabled in this case. We deny this motion as moot.