**Igor VELIKANOV, Plaintiff,**

v.

**UNION SECURITY INSURANCE COMPANY, Defendant.**

Case No. 2:09–cv–03224–FMC–FMOx.

United States District Court, C.D. California.

June 15, 2009.

---

ORDER ON ADMINISTRATIVE
REVIEW

FLORENCE–MARIE COOPER,
District Judge.

The matter is before the Court on administrative review. The Court has read and considered the parties' briefs and the administrative record. As explained herein, the Court reviews the administrative decision *de novo* and concludes that Plaintiff Igor Velikanov is entitled to benefits under the plan.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of a dispute regarding Plaintiff Igor Velikanov's eligibility for long-term disability benefits pursuant to an employee welfare plan governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").

Plaintiff was employed as an electronic test engineer by Capstone Turbine Corporation from September 2001 until April 14, 2005, when Plaintiff ceased to work due to lower back and left leg pain. Plaintiff's job involved the design, fabrication and testing of electronic test equipment for testing electronic subassemblies. A.R. 536. Plaintiff's work was normally performed in a typical interior/office work environment and required the following: sitting for long periods of time; extensive use of a computer; working within a test

laboratory environment including bending, standing, and sitting; and willingness to spend extensive hours beyond a normal 40–hour work week. A.R. 537.

Plaintiff was a participant in a long-term disability plan ("Plan") issued to his employer by Fortis Benefits Insurance Company ("Fortis"), predecessor of Defendant Union Security Insurance Company ("USIC"). The Plan defines disability under an occupation test as follows:

> During the first 24 months of a *period of disability* (including the *qualifying period*), an *injury*, sickness, or pregnancy requires that you be under the *regular care and attendance* of a *doctor*, and prevents you from performing at least one of the material *duties* of your regular occupation; and
>
> after 24 months of *disability*, an *injury*, sickness, or pregnancy prevents you from performing at least one of the *material duties* of each *gainful occupation* for which your education, training, and experience qualifies you.

A.R. 14. One of the material duties of a regular occupation is "the ability to work for an employer on a *full-time* basis as defined in the *policy*." A.R. 15. The qualifying period, or the "length of time during a *period of disability* that [the insured] must be *disabled* before benefits are payable," is 90 days. A.R. 16, 20.

Plaintiff first experienced pain in his lower back on June 26, 2003, when he injured his back while moving heavy electronic equipment at work. The pain grew considerably worse after a couple years, and on March 17, 2005, Plaintiff sought the medical attention of his primary care physician, Dr. Boris Shemer. Dr. Shemer ordered an MRI, and placed Plaintiff on painkillers such as Vicodin and Skelaxin. A.R. 163. After a few more visits, Plaintiff informed Dr. Shemer that the pain had become worse and that the pain killers were only making him drowsy and giving him stomach problems without silencing any of his pain. A.R. 163. An MRI conducted on March 25, 2005 revealed a "bilobed" cyst in the sacral area of the spine (L5–S1 region), and Plaintiff was diagnosed with discogenic disc disease and nerve root compression consistent with a large Arachnoid/Tarlov cyst. A.R. 163, 330. "As a result of the extreme pain, influence of painkillers, and very limited range of motion," Dr. Shemer placed Plaintiff on total temporary disability for two months starting April 14, 2005. A.R. 163, 344. On June 16, 2005, Dr. Shemer extended Plaintiff's disability until July 15, 2005. A.R. 343.

On June 30, 2005, an orthopedic surgeon, Dr. Jan W. Duncan, examined Plaintiff. Plaintiff's chief complaints were pain in the back and numbness in his left leg. A.R. 417. Dr. Duncan noted that Plaintiff's motion was limited due to pain and observed numbness over the lateral femoral cutaneous nerve. Dr. Duncan informed Plaintiff that the numbness in the left leg was not due to the back, but due to the lateral femoral cutaneous nerve. A.R. 418.

On July 7, 2005, after reviewing Plaintiff's MRI, Dr. Duncan diagnosed Plaintiff with myalgia paresthetica and degenerative disc disease with a cyst in the sacral area. Dr. Duncan recommended surgery to release the lateral femoral cutaneous nerve for treatment of the myalgia paresthetica. A.R. 416. On July 14, 2005, Dr. Shemer extended Plaintiff's disability for another month until August 15, 2005.

On August 1, 2005, Plaintiff's coverage under the Plan terminated because his employer stopped making premium payments.

On August 11, 2005, Dr. Duncan informed Plaintiff that he was authorized for his surgery, and Plaintiff agreed to proceed with the surgery. A.R. 415. That

same day, Dr. Shemer issued another disability certificate, stating that Plaintiff was undergoing surgery in September and that he would be disabled until his recovery. A.R. 341.

Shortly thereafter, Plaintiff submitted a claim for LTD benefits on August 16, 2005. A.R. 534–35. Dr. Shemer submitted an Attending Physician's Statement ("APS"), stating that Plaintiff had lower back pain, lumbar radiculopathy, and was diagnosed with discogenic disc disease. A.R. 528–29. Dr. Shemer also reported that Plaintiff had Class 5 limitations (incapable of minimal activity or sedentary work), and was house confined. A.R. 528.

On September 9, 2005, an Assurant analyst, Eileen Garey, contacted Plaintiff. Plaintiff reported that he had a cyst pressing against his nerve fiber in his spine that affected his ability to walk and sit. A.R. 692. He informed the analyst of his scheduled surgery for September 19, 2005, but wasn't sure how long his recovery would take. *Id.* He also told the analyst that he preferred over-the-counter medication over Vicodin. *Id.*

On September 19, 2005, Dr. Duncan performed surgery on Plaintiff to release the left lateral femoral cutaneous nerve for treatment of the myalgia paresthetica. On September 22, 2005, Plaintiff reported that although he still had some numbness, the pain was gone. A.R. 413. On October 6, 2005, Dr. Duncan aspirated about 30 cc of a fluid accumulation in Plaintiff's incision. A.R. 412.

After receiving medical records from Plaintiff's treating physicians in late September (A.R. 472, 479), Ms. Garey contacted Plaintiff again on October 7, 2005 to inquire about his treatment before surgery. Plaintiff informed her that "he didn't receive any treatment because there was nothing that could have been done for his compressed nerve that would have been useful other than surgery." A.R.

690. He indicated that he was still recovering from surgery.

On October 11, 2005, Assurant claims analyst Tracie Badder wrote to Plaintiff to inform him that an extension of time was required for a clinical service review of the medical records from Dr. Shemer and Dr. Duncan. A.R. 688–89.

On November 3, 2005, Assurant conducted an Occupational Assessment, which found Plaintiff's job to fall within the occupation of Engineer, a sedentary to light level occupation. A.R. 626–27.

On November 4, 2005, Ms. Badder spoke with Plaintiff regarding his claim. Plaintiff reported that he was slowly recovering from surgery with some complications and leg numbness, but it was not as bad as before. A.R. 686. Plaintiff also informed Ms. Badder that he didn't have his prescription medication filled because he preferred over-the-counter medication. *Id.* Ms. Badder asked why Plaintiff was not seen by a doctor for three to four months, to which Plaintiff replied that "there was nothing the [treating physicians] could do until they did the surgery." *Id.*

On November 10, 2005, Plaintiff saw Dr. Duncan and reported that the numbness had come back, and he was experiencing significant pain in the back and right hip area. A.R. 411. At this visit, Dr. Duncan decided to prescribe a therapeutic exercise program for Plaintiff. A.R. 368, 411.

On November 11, 2005, a physician consultant for Assurant, Patsy Maikranz, M.D., contacted Dr. Shemer and Dr. Duncan for clarification regarding Plaintiff's limitations and treatment. A.R. 439–41, 445–46. Dr. Maikranz noted in particular that Plaintiff did not require frequent follow up care and did not take prescription medication, and it was unclear why he would be house confined and unable to do sit down work. A.R. 440. Dr. Shemer

responded that Plaintiff was under the care of another physician, and that Dr. Duncan should be contacted for more information on the medication and limitations. A.R. 438. On November 16, 2005, Assurant requested Plaintiff's Workers' Compensation file. A.R. 449. On November 18, 2005, Dr. Maikranz made another request for information to Dr. Duncan. A.R. 431–33.

On November 18, 2005, Dr. Maikranz conducted a review of Plaintiff's claim file. Dr. Maikranz found that the March MRI scan revealed minimal joint disease and degenerative disc disease, but "no disc herniations or central canal or peripheral nerve root compression were noted." A.R. 427. Dr. Maikranz found no indication in the file of Plaintiff's limiting back pain problem. A.R. 428. She found that the diagnosis of degenerative disc disease by Dr. Shemer was not established in the MRI scan and that Dr. Duncan's diagnosis of meralgia paresthetica should be given more weight. *Id.* She also noted that there were no indications that Plaintiff was referred for physical therapy or that he did a home exercise program, and that Plaintiff did not fill his prescription medication. *Id.* She noted that Plaintiff did not stop work until April 15, 2005, and it was unclear what had changed between his March 17, 2005 office visit and the April 15, 2005 onset date. *Id.* Dr. Maikranz concluded that restrictions and limitations could be reasonably expected for up to six weeks after surgery, but not before the surgery date or after the six-week time period. A.R. 429.

On November 30, 2005, Ms. Badder spoke with Dr. Duncan's office and was informed that Dr. Duncan would not fill out the clarifying questions regarding Plaintiff's limitations and medication without a $150 fee. A.R. 408. Instead, Dr. Duncan forwarded his updated progress notes. A.R. 409–18.

On December 7, 2005, Defendant denied Plaintiff's claim for disability benefits. A.R. 397. Defendant informed Plaintiff that the medical records did not indicate that Plaintiff was unable to perform the material duties of his occupation until the time of his surgery on September 19, 2005, and his coverage had ended on August 1, 2005. A.R. 400. Therefore, he was no longer covered under the Plan at the time of his disability. *Id.*

### Post First Denial

On January 12, 2006, Dr. Duncan performed a surgical aspiration of the Tarlov cyst, and about half of the fluid was removed. A.R. 346. Dr. Duncan noted that if a second aspiration did not relieve the symptoms, he would consider a surgical treatment. *Id.*

On February 2, 2006 both Dr. Shemer and Dr. Duncan completed Residual Functional Capacity Questionaires with consistent statements: vertobrogenic disorders that persisted for at least 3 months despite prescribed therapy and were expected to last 12 months; decreased range of motion; patient is not a malingerer, and emotional factors do not contribute to the severity of the patient's symptoms and functional limitations; impairments are reasonably consistent with symptoms and functional limitations; and patient is unable to work. A.R. 370–87.

On February 2, 2006, Plaintiff was examined by neurologist Jay Jurkowitz, M.D. for a Qualified Medical Evaluation in connection with his workers' compensation claim. Plaintiff reported that his back pain was about 50% better, but complained of erectile dysfunction. A.R. 199. Dr. Jurkowitz noted that Plaintiff's gait was normal, but that his walking was a little slow, secondary to pain in his back. A.R. 193. He also found decreased pinprick sensation in both upper arms and in the left foot, and almost complete numbness in

the left lateral thigh. *Id.* Dr. Jurkowitz concluded that the sensory level problems could not have anything to do with the cyst in his low back, and ordered an MRI scan of his brain, cervical spine, and thoracic spine, so that a better diagnosis could be made before any further procedures were done to the cyst. A.R. 194. Dr. Jurkowitz recommended that "[i]n the meantime he should be kept on temporary total disability." A.R. 194.

On March 2, 2006, Plaintiff appealed his claim denial. On March 21, 2006, Assurant appeals specialist Lee Watkins wrote to Plaintiff informing him that an independent medical examination would be arranged with an orthopedic surgeon. A.R. 308–90.

On March 22, 2006, a lumbar spine MRI revealed a mass lesion in the central spinal canal from the S1 to S3 levels, which was consistent with "multiple confluent Tarlov's cysts." A.R. 171–72. It also revealed a 2–3 mm diffuse posterior disc bulge at the L4–5 level, and a 3 mm central posterior disc bulge with a small tear within the posterior periphery of the annulus at the L5–S1 level. *Id.*

On April 19, 2006, Jerrold M. Sherman, M.D., an orthopedic surgeon hired by Assurant, performed an independent medical examination ("IME") of Plaintiff. Dr. Sherman noted that Plaintiff has a normal gait, performs a 100%-normal squatting maneuver without difficulty, easily brings his fingertips to the level of his ankles, and that his spine has a 100%-normal range of motion with the complaint of low back pain at the extremes of the ranges of motion. A.R. 232. Dr. Sherman concluded that the meralgia paresthetica had been satisfactorily treated with surgery and required no further treatment, but the sacral cyst would require another aspiration proce-

dure and "most probably will require eventual surgical excision." A.R. 234. He found that the objective findings and subjective symptoms were consistent with Plaintiff's diagnoses and physical examination. *Id.* He then opined that Plaintiff was able to work 40 hours per week and could frequently lift 30 pounds and occasionally 70 pounds, with no restrictions regarding forward bending at the waist, crouching or kneeling. *Id.*

That same day and the day after, Assurant conducted a video surveillance of Plaintiff, which revealed Plaintiff walking with an affected gait, driving, pulling weeds from his front yard, pulling trash containers to the back of his home, and sweeping his porch. A.R. 278–84, accompanying DVD.

On May 5, 2006, Dr. Jurkowitz examined Plaintiff again for a follow-up workers' compensation Qualified Medical Evaluation ("QME"). Dr. Jurkowitz found that his neurological picture had actually deteriorated since he last saw him on February 2, 2006.[1] He also noted that Plaintiff's pain was "clearly worse," and now took between 1/2 and 2 Vicodins per day. Dr. Duncan also performed a second aspiration of Plaintiff's cysts some time in May of 2006. A.R. 216.

On May 8, 2006, Assurant upheld its denial of Plaintiff's claim, informing Plaintiff that he did not exhibit limitations severe enough to prevent him from performing the material duties of his job. A.R. 251.

**Post Second Denial**

On May 28, 2006, Assurant adjuster, Larry Van Draska, reported to the California Department of Insurance (DOI) that he suspected Plaintiff of filing a fraudulent claim. A.R. 241. The DOI responded in a letter dated June 26, 2006 that the matter

1. Plaintiff now had not only impotence, which had become complete, but urinary urgency and frequency, which was not present on February 2, 2006. A.R. 186.

warranted investigation and forwarded a copy of the letter to the Los Angeles County District Attorney's Office. A.R. 227.

On June 22, 2006, Dr. Duncan wrote a letter regarding Plaintiff's disability status. He stated that Plaintiff had continued significant pain in the back and legs and significant recurrence of the lateral femoral cutaneous nerve. A.R. 216. He also opined that Plaintiff was disabled for "any type of work at this time" because he could not do significant standing, stooping, bending or lifting. Nor could he sit for prolonged periods of time. *Id.*

On July 2, 2006, the Social Security Administration deemed Plaintiff disabled as of April 15, 2005 and awarded Plaintiff disability benefits beginning October 2000.

On August 29, 2006, Plaintiff saw specialist neurosurgeon, Sasan Yadegar, M.D., for a neurosurgical evaluation. Plaintiff complained of continued erectile dysfunction, increasing low back pain and increasing difficulty walking. A.R. 224. Dr. Yadegar did not recommend any surgical intervention for the Tarlov cyst as it would recur, no matter what was done to it. A.R. 225. He also stated that aspiration with a needle was completely useless since it will recur within 24–48 hours and the cyst will fill up. A.R. 225.

On October 24, 2006, Plaintiff appealed his claim denial a second time. The second review included records from the Social Security Administration dated July 2, 2006 awarding Plaintiff disability benefits, Dr. Duncan's June 22, 2006 disability status letter, the May 7, 2006 QME report by Dr. Jurkowitz, and an August 29, 2006 report by Dr. Yadegar to Dr. Shemer. A.R. 202–25.

On November 22, 2006, Ms. Watkins wrote to Plaintiff, informing him that the Disability Claims Appeals Committee wished to request records from the Social Security Administration and his workers compensation carrier. A.R. 646.

On January 22, 2007, in connection with Plaintiff's workers' compensation claim, Frederic L. Edelman, M.D. performed an Agreed Medical Examination ("AME"). Plaintiff complained of low back pain with radiation into both buttocks as well as into the anterior thighs and the lateral aspect of both feet. A.R. 135. Dr. Edelman noted that Plaintiff was in no distress at rest and his low back revealed no deformity or tenderness. A.R. 137.

On April 4, 2007, Ms. Watkins wrote to Plaintiff, informing him that the workers' compensation carrier, Specialty Risk Services, Inc. ("SRS") had not provided the requested information, and that an independent physician review would be conducted of Plaintiff's file regardless of whether a response was received within the next week. A.R. 142. On April 16, 2007, SRS faxed the AME conducted by Dr. Edelman on January 22, 2007. A.R. 133–39.

On April 26, 2007, Assurant hired Brian Mercer, M.D. to conduct another medical record review of Plaintiff's case. Dr. Mercer opined that "the degree of reported symptoms by Mr. Velikanov through the first half of 2006 exceed the objective findings." A.R. 94. However, he reported that the more recent findings would be "consistent with development of a worsening pain syndrome affecting the lumbar region radiating down the left leg to the lateral foot." A.R. 94. Dr. Mercer acknowledged that large Tarlov cysts "might cause symptoms of low back pain and radicular symptoms of weakness and pain and sensory loss, if a nerve root is being compressed or compromised by the cyst." A.R. 95. He ultimately concluded that the meralgia paresthetica would have limited Plaintiff to a light-medium level of functionality from April 15, 2005 through sev-

eral weeks after his surgery, A.R. 97, and that Plaintiff would be limited to a full-time sedentary occupation with an opportunity to change position hourly as necessary from some point beginning between August 2006 and January 22, 2007 and onward. A.R. 94.

On May 10, 2007, Assurant again upheld its denial of Plaintiff's claim on the basis that the medical evidence between April 15, 2005 and August 2006 did not support a condition that was severe enough to preclude Plaintiff from performing his job. A.R. 103. Assurant concluded that Plaintiff was not disabled from his occupation for at least the 90–day qualifying period when he ceased work on April 15, 2005. *Id.*

## II. EVIDENTIARY RULINGS

Defendant USIC seeks to strike the information contained in footnotes 2, 3, 4, 5, 9 and 10 of Plaintiff's Opening Brief, as well as the declaration of Alan E. Kassan, along with the attached exhibits. Plaintiff argues that this evidence is relevant to aid the Court in understanding the medical issues at hand and to evaluate the reliability and credibility of Defendant's consultants.

A district court may, in its discretion, consider new evidence that was not before the plan administrator "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943–44 (9th Cir.1995). "Evidence that meets this standard need not satisfy the strict rules for the admissibility of evidence in a civil trial, and may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability." *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 978 (9th Cir.1999). "[E]xceptional circumstances where intro-duction of evidence beyond the administrative record could be considered" include (1) "claims that require consideration of complex medical questions or issues regarding the credibility of medical experts;" and (2) "instances where the payor and the administrator are the same entity and the court is concerned about impartiality." *Opeta v. Northwest Airlines Pension Plan for Contract Employees,* 484 F.3d 1211, 1217 (9th Cir.2007) (citing *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1027 (4th Cir.1993)).

Both circumstances are present in the instant case. The evidence that Defendant seeks to strike are definitions of medical terms and evidence regarding the credibility of the medical experts used by Defendant.

Footnotes 2, 3, 4 and 5 provide definitions of medical terms the Court is not familiar with. Footnote 9 contains a website reference where Dr. Sherman advertises that he has completed over 1000 IME's. This information is relevant to show Dr. Sherman's lack of impartiality. Footnote 10 is a case law reference that shows Dr. Mercer is not in clinical practice, but spends 100% of his time working for UDC. It shows that courts have criticized UDC's relationship with insurance companies. This information is also relevant for reliability issues.

## III. DISCUSSION

### A. Standard of Review

Plaintiff argues that the Court should apply a *de novo* standard of review in reviewing his claim because discretionary authority was not unambiguously granted to Defendant under the terms of the Plan. Plaintiff contends that there is no evidence of any grant of discretion to Fortis' successor USIC or to Assurant Employee Benefits, "the entity that made all of the claims

and benefits decisions." Pl. Opening Brief, p. 22, lns. 16–20. Defendant counters that Assurant Employee Benefits is "not a separate existing entity, but merely a marketing name of USIC," and that "Fortis became USIC, whose name change was evidenced by an amendment to the Policy." Def. Resp. Brief, p. 2, lns. 11–16.

In its trial brief and related filings, Defendant failed to provide the Court with sufficient evidence that Assurant Employee Benefits has been granted discretionary authority under the Plan. On March 27, 2009, the Court issued an Order to Show Cause ("OSC") why the Court should not adopt a *de novo* standard of review, and ordered Defendant to submit admissible evidence regarding Assurant Employee Benefits' status and whether it possesses discretionary authority. Defendant responded on April 8, 2009, and attached a declaration from Heather Yows, a Marketing Officer of Union Security Insurance Company, stating Assurant Employee Benefits is only a marketing name used by USIC. Plaintiff filed a response to the Court's OSC on April 9, 2009, and attached its own evidence regarding Assurant Employee Benefits. The Court's OSC dated March 27, 2009 is hereby discharged.

█ The Supreme Court has held that a denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." *Burke v. Pitney Bowes, Inc. Long–Term Disability Plan*, 544 F.3d 1016, 1023–24 (9th Cir.2008) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) (en banc)).

Pursuant to 29 U.S.C. § 1105, a plan administrator may delegate its fiduciary duties to a third party if the plan expressly provides for such delegation.[2] In applying section 1105, the Ninth Circuit held that an ERISA claim is subject to the arbitrary and capricious standard of review where (1) the ERISA plan expressly gives discretionary authority to the administrator or fiduciary and (2) a named fiduciary properly delegates its discretion to another fiduciary pursuant to 29 U.S.C. § 1105(c)(1). *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283–84 (9th Cir. 1990).

█ Here, the Court cannot find that the Plan unambiguously confers discretionary authority to the plan administrator, Assurant Employee Benefits. First, the Plan expressly grants discretionary authority to "Fortis Benefits Insurance Company."[3] Defendant's assertion that "Fortis became USIC" is not supported with any documentation other than an amendment to the Plan wherein the company name, Fortis, is replaced with USIC. A.R. 1, 3. Defendant's response to the Court's OSC also fails to adequately establish that Fortis became USIC. There is no documentary support for the proposition that

---

**2.** 29 U.S.C. § 1105(c)(1) provides: "The instrument under which a plan is maintained may expressly provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities."

**3.** The Plan provides: "We have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determinations and interpretations made by us are conclusive and binding on all parties." A.R. 34. "We" is defined as "Fortis Benefits Insurance Company." A.R. 13.

Fortis changed its name to USIC. Ms. Yows' declaration simply makes the standalone statement that USIC was formerly known as Fortis Benefits Insurance Company.

Second, even if the Court were to assume that USIC became vested with discretionary authority as Fortis' successor-in-interest, Defendant fails to establish that any discretionary authority was granted to Assurant, Inc., or to Assurant Employee Benefits. Defendant contends in its trial brief and response to the Court's OSC that Assurant Employee Benefits is merely a marketing name of USIC. However, Defendant fails to submit or point to any documentary evidence that supports this contention. The Court declines to accept Ms. Yows' statement that Assurant Employee Benefits is a marketing name of USIC as conclusive evidence.

Moreover, the remaining evidence before the Court supports a finding that Assurant Employee Benefits, though related to USIC, is a separate entity from USIC. Letters written on Assurant Employee Benefits letterhead contain the footer: "Products and services marketed by Assurant Employee Benefits are underwritten and/or provided by Union Security Insurance Company." *See, e.g.,* A.R. 397, 650. There is also evidence to suggest that Assurant Employee Benefits may be distinct from Assurant, Inc. In its disclosure statement filed with the Court on December 19, 2007, Defendant represented that "Assurant, Inc., a publicly traded company, is the parent company of [USIC]." Plaintiff's response to the Court's OSC attaches evidence that Assurant, Inc. is a separately registered corporate entity from USIC. (Pl.'s Resp. to OSC, Exs. B–E.) Accordingly, the Court finds that Assurant Employee Benefits was not authorized to possess discretionary authority pursuant to the Plan provisions. The Court hereby reviews Defendant's denial of long-term disability benefits under a *de novo* standard of review. *See Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098, 1105 (9th Cir.2003) (noting that while courts give deference to the "decisions of plans in which their language grants discretionary authority, that deference applies only when the decision is made by the body vested with discretion.").

## B. *De Novo* Review of Plaintiff's Claim

The Ninth Circuit has determined that ERISA insurance disability benefit disputes may be resolved through a bench trial on the administrative record. *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999). A bench trial on the record requires the judge to make findings of fact under Federal Rule of Civil Procedure 52(a). *See id.* at 1095. "The process of finding the facts 'specially,' as [Federal Rule of Civil Procedure 52(a)] requires, sometimes leads a judge to a different conclusion from the one he would reach on a more holistic approach.... Thus trial on the record, even if it consists of no more than the trial judge rereading what he has already read, and making findings of fact and conclusions of law ... may have real significance." *Id.* In applying these principles to a bench trial on the administrative record, "the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.*

Moreover, when the court reviews an administrator's denial of disability benefits *de novo,* the court does not give deference to the administrator's decision. *Id.* Rather, the district court reviews *de novo* both the plan interpretation and the factual determinations of the plan administrator. *See Walker v. Am. Home Shield Long Term Disability,* 180 F.3d 1065, 1068–70 (9th Cir.1999).

■ "On *de novo* review, a district court may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator." *Jebian,* 349 F.3d at 1109 n. 8 (quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)).

■ "[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 970 (9th Cir.2006). The administrative record generally consists of the record that was before the administrator when the decision was made. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976–77 (9th Cir.1999). "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* (citing *Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir.1999)).

■ Pursuant to *de novo* review of the administrative record, the Court finds that Plaintiff was disabled within the meaning of the Plan's terms—Plaintiff incurred an injury that required him to be under the regular care and attendance of a doctor, and prevented him from performing at least one of the material duties of his regular occupation, for at least ninety (90) days after Plaintiff ceased working on April 15, 2005. The Court reaches this result from the following findings of fact and conclusions of law:

The administrative record reveals that Plaintiff suffered from a sacral cyst in his lower back, meralgia paraesthetica, and discogenic disc disease. Plaintiff's treating physician and orthopaedic surgeon, Dr. Boris Shemer and Dr. Jan Duncan, both concluded in their Residual Functional Capacity Questionnaire, as well as multiple other reports and statements, that Plaintiff is unable to work, because he cannot stand, stoop, bend or sit for prolonged periods of time without incurring significant pain. *See. e.g.,* A.R. 216, 336, 370, 379. Though Plaintiff has at times shown signs of temporary improvement—such as immediately after surgery—Plaintiff's problems quickly resurfaced and appear to be permanent. This is evidenced by the repeated aspirations performed on Plaintiff, and is confirmed by Dr. Sasan Yadegar, a specialist in neurological and spinal surgery, who physically examined Plaintiff and concluded that the Tarlov cyst "will recur, no matter what is done to it. . . . The aspiration with a needle is completely useless since it will recur within 24–48 hours and the cyst will fill up." A.R. 225.

Furthermore, neurologist Dr. Jay Jurkowitz performed a Qualified Medical Evaluation of Plaintiff in connection with his workers' compensation claim, and physically examined Plaintiff on two occasions. Dr. Jurkowitz recommended that Plaintiff be kept on temporary total disability after the first examination, and concluded that his neurological picture actually deteriorated after the second examination. "The main thing that keeps him from going back to work at this time is the pain which has clearly [gotten] worse than when I saw him on February 2, 2006." A.R. 222. There is no evidence in the record that these physicians are biased or otherwise lacking in credibility.

On the other hand, Defendant's decision to deny Plaintiff disability benefits is based

upon the following evidence that the Court finds to be less credible or less probative of the question before the Court. Defendant's initial denial of benefits was based upon Dr. Patsy Maikranz's review of Plaintiff's medical records on November 18, 2005. Dr. Maikranz noted that prior to his surgery date of September 19, 2005, Plaintiff did not require frequent office visits or prescription medication. Dr. Maikranz also concludes that there is no indication that Plaintiff was limited from the meralgia paresthetica diagnosis prior to his surgery date, and that post-surgery, Plaintiff can return to work after six weeks of recovery time, with no restrictions or limitations. A.R. 429. Dr. Maikranz' observations and conclusions clearly contradict the evidence before the Court. The record shows Plaintiff regularly visited his treating physicians between March 17, 2005 and September 19, 2005. The physicians prescribed painkillers such Vicodin and Skelaxin, but due to their side effects, Plaintiff opted to take over-the-counter medication. A.R. 163. Plaintiff's meralgia paresthetica must have been problematic, as the purpose of Plaintiff's surgery on September 19, 2005 was to treat it. Post-surgery, Plaintiff continued to receive treatment, medication, and surgical aspirations of the Tarlov cyst for an extended period of time. In addition, Dr. Maikranz' evaluation of Plaintiff's medical records is not entitled to as much weight as that given to a treating physician on *de novo* review. *Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098, 1109 n. 8 (9th Cir.2003).

After Defendant's first denial of benefits, Defendant employed Dr. Jerrold M. Sherman to conduct an Independent Medical Evaluation ("IME") of Plaintiff. Dr. Sherman noted that Plaintiff's complaints included constant aching low back pain with an intensity of four to eight out of ten. He observed that Plaintiff can lift ten (10) pounds easily. Dr. Sherman opined that the objective findings and subjective symptoms are consistent with his diagnoses and physical examination. Nonetheless, Dr. Sherman concluded that Plaintiff can work 40 hours per week, eight hours per day, without any bending, crouching, or kneeling restrictions, and without any workplace accommodations. He also concluded Plaintiff can lift 30 pounds frequently, and occasionally 70 pounds. A.R. 231, 234. There is no explanation how Plaintiff can work these extended periods of time with his constant low back pain, and no explanation how lifting 10 pounds corresponds to lifting as much as 70 pounds occasionally. Dr. Sherman appears to attribute these abilities to the surgical treatment of Plaintiff's meralgia paresthetica. Dr. Sherman acknowledges Plaintiff will require additional aspiration of the sacral cyst followed by surgical excision of the cyst should it recur, but does not opine whether the cyst has any adverse impact on Plaintiff's abilities. A.R. 234, 235. In addition, Dr. Sherman advertises that he has completed over 1000 IMEs, which is a sign he frequently evaluates patients at the request of insurance companies.

After the second denial of benefits, Defendant employed Dr. Brian Mercer of University Disability Consortium ("UDC") to perform a final review of Plaintiff's medical records. Dr. Mercer works exclusively for UDC, performing medical record reviews and IMEs for insurance companies. (Kassan Decl. in Support of Opening Brief, Ex. A at 10.) Among other promises, UDC advertises that its services will probably result in "[i]mproved denial and closure rates and reduced costs." (Kassan Decl., Ex. A. at 41.) *See also Caplan v. CNA Financial Corp.,* 544 F.Supp.2d 984, 990 (N.D.Cal.2008) (describing UDC's close relationship with Hartford Life Group Insurance Company). In his report, Dr. Mercer describes, "[a]n impor-

tant aspect in determining the clinical significance of a Tarlov cyst is [ ] whether nerve root compression is present." A.R. 92. Relying upon Dr. Sherman's IME, Dr. Mercer believes Dr. Sherman did not find any nerve root compression from his exam. A.R. 89. This is erroneous. Dr. Sherman in fact diagnosed an Arachnoid cyst, sacral spine, recurrent, with spinal nerve root compression. As a result of UDC's bias and Dr. Mercer's erroneous observation, the Court does not find Dr. Mercer's conclusions to be inherently reliable.

Defendant's denial of benefits also relies upon a surveillance video taken of Plaintiff on April 19, 2006. The surveillance video runs for approximately 15 minutes and shows Plaintiff is able to bend, stoop, and squat to pull weeds from his front yard for a few minutes at a time. Plaintiff is also able to pull large empty trash containers, and drive his car for approximately 30–40 minutes. On the other hand, Plaintiff is often seen walking with an affected gait. Despite the evidence that Plaintiff can stand, sit, bend, and pull certain items, the surveillance video is of limited duration and of limited probative value. Moreover, Dr. Sherman's IME and physical examination that same day already reveals that Plaintiff can perform a "100%-normal squatting maneuver without difficulty," and can "easily bring [ ] his fingertips to the level of his ankles" while sitting up. There is no direct evidence Plaintiff can perform his job functions for extended periods of time, and perform them without developing significant pain. The Court therefore does not find the surveillance video to constitute persuasive evidence that would overcome the evidence provided by Doctors Shemer, Duncan, Jurkowitz, and Yadegar.

From these findings of fact, the Court concludes as a matter of law that pursuant to *de novo* review of the administrative record, Plaintiff was disabled within the meaning of the Plan's terms, for at least ninety (90) days after Plaintiff ceased working on April 15, 2005.

## IV. CONCLUSION

For the foregoing reasons, the Court determines Plaintiff is entitled to disability benefits under the Plan. The Court's OSC dated March 27, 2009 (docket no. 36), is hereby discharged. Plaintiff is to prepare and lodge a proposed Judgment, consistent with this Order, within ten (10) days from the date of this Order.

**IT IS SO ORDERED.**