NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0007n.06

No. 08-3848

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| **CARLEY L. CUNNINGHAM**, for John R. Cunningham, Deceased, | ) ) |
|     *Appellant*, | ) ) ) |
| v. | ) ) |
| **MICHAEL J. ASTRUE**, Commissioner of Social Security, | ) ) ) |
|     *Appellee*. | ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**O P I N I O N**

**FILED**

**Jan 05, 2010**

LEONARD GREEN, Clerk

**BEFORE: RYAN, COLE and CLAY, Circuit Judges.**

**COLE, Circuit Judge.** Claimant-Appellant John Cunningham appeals the district court's order affirming the denial of his application for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) by Defendant-Appellee Commissioner of Social Security. Cunningham contends that the district court's ruling should be reversed because the decision by the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Cunningham also argues that the district court incorrectly adopted the ALJ's determination that Cunningham's subjective complaints were not entirely credible. Cunningham died on March 27, 2008. His mother, Carley Cunningham, in whose name this appeal was filed, died sometime prior to May 20, 2009. Cunningham's surviving brother and sisters have filed a motion seeking to be substituted as claimants-appellants. For the following reasons, we **REMAND** to the Commissioner for further consideration.

## I. BACKGROUND

**A.      Factual background**

Cunningham was born on April 8, 1962, and died on March 27, 2008. He was awarded a closed period of DIB from April 1993 through May 1998, but contends that various ailments caused him to again become disabled beginning May 1, 1998. Cunningham had suffered from Type I Diabetes Mellitus since age 11 and, in April 1993, was diagnosed with end-stage renal disease. In 1995, Cunningham received a kidney transplant. Also in 1995 following severe retina problems, Cunningham had surgery on his left eye; he underwent the same procedure on his right eye the previous year.

Prior to 1993, Cunningham held several jobs: he worked building metal lathes, worked as a restaurant cook, and worked in construction. Cunningham had not worked since November 2000, when he stepped on a nail and severely infected his right foot.

Even after his kidney transplant, Cunningham frequently sought emergency care for his diabetes. For example, from August 31, 2000 to September 6, 2001, Cunningham made at least seven trips to the emergency room, usually due to low blood sugar or unresponsiveness. On multiple occasions, he voluntarily left the hospital shortly after arrival. His diabetes-related vision problems persisted post surgery as well. The record contains information regarding two ophthalmological exams. The first occurred in 1999, in which Cunningham's treating ophthalmologist diagnosed Cunningham with clinically significant retina problems in both eyes. He found Cunningham's corrected vision to be 20/50 in the right eye and 20/30 in the left eye. The second exam occurred in 2001, in which a consultative ophthalmologist diagnosed Cunningham with incipient cataracts in both eyes. He found Cunningham's corrected vision to be 20/30-2 in the right eye and

20/20-2 in the left eye and concluded that Cunningham could perform most work-related activities from an eyes standpoint.

Cunningham also suffered from problems with fatigue. Multiple physicians examining Cunningham from 1999-2004 indicated that he experienced weakness, poor balance, light headedness, and dizziness. In fact, based on a consultative exam conducted in 2001, Dr. Benjamin Berger concluded that "[o]n the basis of the objective examination, the marked increased fatigueability associated with his underlying problem is going to interfere with most forms of gainful employment." (Administrative Transcript ("Tr.") at 511.) In addition, Cunningham suffered from bouts with diarrhea, including a 2004 hospitalization.

The record contains multiple assessments of Cunningham's ability to stand, sit, carry weight, and manipulate objects. Most assessments concluded that Cunningham was capable of standing for one hour at a time, although one doctor, based on a review of Cunningham's medical files, concluded that Cunningham could stand for roughly six hours in an eight-hour workday. The assessments concluded that Cunningham could sit anywhere from two to eight hours and could occasionally lift anywhere from twenty to twenty-eight pounds. Several assessments indicated that Cunningham suffered motor impairment and had limited manipulative ability. Specifically, a 2002 work evaluation conducted by Goodwill Industries, based on five days of employment at one of the organization's stores, indicated that Cunningham was capable of completing an eight-hour workday without taking extra breaks or rest periods, that his stamina was not a factor in his performance, and that he had "great difficulty" working with small parts and small tools because he had a partial amputation of his great finger on his right hand and an injury to the thumb of his left hand. (*Id.* at 734.)

**B.      Procedural background**

Cunningham was initially granted DIB beginning April 2, 1993, due to end-stage renal disease; his DIB ended in May 1998. Cunningham's date last insured was June 30, 2003; therefore, in order for Cunningham to be entitled to DIB, the evidence must demonstrate that he had a disability that began on or before June 30, 2003. Cunningham filed an application for DIB on June 26, 2001,[1] claiming disability beginning May 1, 1998, due to post kidney transplant status, diabetes, heart problems, fatigue, inability to carry weight, and unstable balance. The application was denied on November 5, 2001, and Cunningham filed a request for reconsideration, which was denied on February 7, 2002. On May 14, 2002, he filed a request for hearing.

### 1. ALJ hearings

An ALJ hearing was scheduled for August 24, 2004, which was continued in order for Cunningham to obtain further medical evidence. A second hearing occurred on October 5, 2004, at which Cunningham testified that he had trouble maintaining his blood glucose level; suffered from exhaustion, which required him to take a nap every afternoon; had trouble sitting and standing for more than a couple hours at a time due to his diabetes; had a difficult time maintaining his balance; could cook, load a dishwasher, wash dishes, run a vacuum cleaner, sweep a floor, make a bed, write, and read with his glasses; had limited feeling in his hands and fingers, such that he could not pick a penny up off of a table; and suffered from diarrhea due to his

---

[1] Cunningham also filed applications on August 23, 1999, and October 26, 2000, which were denied initially and on reconsideration; and May 6, 2002, which was escalated and included in the ALJ's July 8, 2005 decision.

transplant medications. This hearing was also continued. A third hearing took place on April 12, 2005, at which both Cunningham and Vocational Expert ("VE") Mark Anderson testified.[2]

The ALJ posed the following relevant hypothetical to the VE to determine if Cunningham could perform substantial activity in the national economy. It posited an individual

> Same age, education, vocational background of the claimant here before us today. Limited to lifting . . . [five] pounds frequently, up to [ten] pounds occasionally. . . . [He]can sit for six hours out of an eight-hour workday, stand and walk for two hours out of an eight-hour workday. No unprotected heights, no ropes, ladders, scaffolds. Occasional – and I should put it very occasionally – ramps and stairs. No uneven surfaces. No temperature extremes, no balancing requirements, occasional stooping. Going to preclude him from working with small parts – that's because of a partial amputation of the great finger, this thumb on his left hand – oh, on his right hand. . . . And he has a minor loss of visual acuity, which would probably go with the small parts in a different way than the thumb. So linking those two together – no close visual acuity. . . .

(Tr. at 59.) The VE testified that the hypothetical individual could only perform jobs at the sedentary level,[3] which would include the jobs of document preparer and security camera monitor. The VE noted that he "excluded jobs that would require constant near acuity or constant – for over 2/3 of a day spent doing jobs that required near acuity." (*Id.* at 61.) And the VE stated that his findings are consistent with requiring a sit/stand option; did not require rapid, repetitive use of the hands or arms; and did not require kneeling, crawling, stooping, interaction with fumes or dust, and only occasional crouching.

---

[2] It should be noted that at this hearing Cunningham's counsel arrived 20 minutes late and asked the ALJ, at the end of the hearing, "Can I just submit a – something in writing, please? I just – I am having a real hard time functioning, right now." (Tr. at 54, 74.)

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

With regards to Cunningham's need for afternoon naps, the VE stated:

> These jobs all contemplate that an individual in any given hour is going to be on task – or put another way, will not be off task more than five or seven minutes. If an individual for whatever reason in taking a nap is fatigued, is not able to sustain themselves or they need to rest or be off task more than five or seven minutes, th[e]n they're generally not going to be employable on the kind of jobs that I talked about or any jobs for that matter. . . . If anything took him off task more than seven minutes in any given hour and that continued, then they would not be employable.

(*Id.* at 70-71.)

The VE testified that these two jobs existed in substantial numbers in the economy: (1) document preparer – 250,000 jobs nationally; 25,000 jobs in Ohio; 4,000 jobs locally; (2) security camera monitor – 125,000 jobs nationally; 5,000 jobs in Ohio; 1,200 jobs locally.

*2. ALJ decision*

On July 29, 2005, after reviewing the relevant evidence, the ALJ concluded that the Commissioner had satisfied his burden of showing that a significant number of jobs existed in the national economy that Cunningham could perform such that he was not disabled under the Social Security Act ("SSA"). Specifically, the ALJ determined that

> Cunningham could occasionally lift weights up to 10 pounds, frequently lift weights up to five pounds, sit for six hours during the course of an eight-hour workday, and stand and walk for two hours during a normal eight-hour workday. Cunningham could not work on unprotected heights and only very occasionally climb ramps or stairs. Cunningham must avoid temperative and humidity extremes, only occasionally stoop, and never bend. Because of a minor loss of visual acuity and the partial loss of right great finger and thumb, Cunningham was precluded from working with small parts. Cunningham could not perform rapid, repetitive motions with his arms and hands.

(*Id.* at 31.) The ALJ concluded that Cunningham could perform the functions of jobs such as document preparer and security camera monitor. In reaching his conclusion, the ALJ specifically found that

Cunningham's allegations regarding his symptoms and limitations were not entirely credible because "Cunningham's statements regarding the minimal amount of activity that provokes extreme fatigueability is inconsistent with his daily activities as reported at the hearing and in the record," and because "Cunningham has been treated in an emergency room environment on numerous occasions for complications arising from his diabetes, on many occasions he recovered without treatment or left against medical advice without adverse consequences." (*Id.* at 28-29.)

The Appeals Council denied Cunningham's request for a review of the ALJ's decision; therefore, the ALJ's decision became the final decision of the Commissioner. *See Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

Cunningham appealed the ALJ's decision in the federal district court for the Northern District of Ohio, and, on February 25, 2008, a magistrate judge rendered a Report and Recommendation ("R&R") concluding that the Commissioner's decision should be affirmed. *Cunningham v. Astrue*, No. 1:06CV1418 (N.D. Ohio 2008). The magistrate judge found that substantial evidence supported the ALJ's decision "to discount [Cunningham's] credibility relating to the impact of his fatigueability and loss of muscle strength and balance on his ability to work." *Id.* at 26. He found, however, that substantial evidence did not support the ALJ's conclusion that Cunningham could perform the job of document preparer. But since the magistrate judge found that substantial evidence supported the ALJ's conclusion that Cunningham could perform the job of security camera monitor, and that this job existed in significant numbers in the national economy, he concluded that the ALJ's decision finding Cunningham not disabled should be affirmed. On April 30, 2008, the district court adopted the R&R and affirmed the Commissioner's decision. Cunningham died on March 27, 2008, and Carley Cunningham, John Cunningham's mother, timely appealed the district court's decision

to this Court on June 30, 2008. The appeal asserts that the district court's decision should be reversed because the ALJ's decision is not supported by substantial evidence. Carley Cunningham has since died.

## II. ANALYSIS

### A. Substitution of parties

Before reaching the merits of Cunningham's appeal, we must decide whether to grant the pending motion to substitute parties. The Commissioner does not oppose the motion. First, we must resolve whether Cunningham's social security claim survives his death. If his federal claim survives, we must then determine whether Patrick Cunningham, Margaret A. DeNiro, and Mary Elizabeth Stump, Cunningham's surviving brother and sisters, may be substituted pursuant to Federal Rule of Appellate Procedure 43(a)(1).

Cunningham's social security claim does survive his death, and payment of any amount due should be made to "the legal representative of the estate of the deceased individual, if any," since Carley Cunningham died prior to any payment being completed. 42 U.S.C. § 404(d)(7); 20 C.F.R. § 404.503(b)(7). "Legal representative" is defined as "the administrator or executor of the estate of the deceased individual. However, it may also include an individual, institution or organization acting on behalf of an unadministered estate, provided that such person can give the Administration good acquittance," i.e., "payment to that person will release the Administration from further liability for such payment." 20 C.F.R. § 404.503(d); 20 C.F.R. § 404.503(e). Here, John Cunningham died intestate and without the assets needed to probate his estate. Under Ohio law, when a person dies intestate, his real estate or inheritance shall pass to "the brothers and sisters . . . or their lineal descendants" if "there is no spouse, no children or their lineal descendants, and no parents surviving." Ohio Rev. Code Ann. § 2105.06(G) (2009). Such is the situation here.

Next, we determine whether the requested substitution is proper under Federal Rule of Appellate Procedure 43(a)(1). The rule states:

> If a party dies after a notice of appeal has been filed or while a proceeding is pending in the court of appeals, the decedent's personal representative may be substituted as a party on motion filed with the circuit clerk by the representative or by any party. A party's motion must be served on the representative in accordance with Rule 25. If the decedent has no representative, any party may suggest the death on the record, and the court of appeals may then direct appropriate proceedings.

We have flexibility to determine whether a "personal representative" has been substituted. *See Bennett v. Tucker*, 827 F.2d 63, 68 (D.C. Cir. 1987) ("personal representative" "refers to an individual recognized by state law, such as an executor"); *AFL-CIO, Local 3882 v. Fed. Labor Relations Auth.*, 944 F.2d 922, 940 (D.C. Cir. 1991) (same). Given the statute and regulation defining the manner in which a social security claim survives death, 42 U.S.C. § 404(d)(7), 20 C.F.R. § 404.503(b)(7), and the Ohio Code articulating the manner in which a decedent's intestate estate shall pass, Ohio Rev. Code Ann. § 2105.06(G), we conclude that John Cunningham's brother and sisters are "personal representatives" within the meaning of Federal Rule of Appellate Procedure 43(a)(1) and are therefore properly substituted parties.

**B.     Disability appeal: standard of review**

This Court reviews the district court's decision de novo. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Our review of the Commissioner's decision is limited to determining whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Colvin v. Barnhart*, 475 F.3d 727, 729-30 (6th Cir. 2007). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y Health & Human Servs.*, 25 F.3d 284, 286 (6th

Cir. 1994) (per curiam) (citation omitted). "If the Commissioner's decision is supported by substantial evidence, we must defer to that decision even if there is substantial evidence in the record that would have supported an opposite conclusion," *Colvin*, 475 F.3d at 730 (quotation marks and citation omitted), and "even if the reviewing court would decide the matter differently." *Cutlip*, 25 F.3d at 286. "This court does not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Id.* at 286 (citations omitted).

To make a determination as to disability, an ALJ undertakes a five-step sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(i)-(v). First, the ALJ determines whether the claimant is engaged in substantial gainful activity; if he is, he is not disabled. *Id.* § 404.1520(a)(4)(i). Second, the ALJ determines whether the claimant suffers a severe medically determinable physical or mental impairment; if he does not, he is not disabled. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P. App.1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ considers the claimant's residual functional capacity ("RFC") to determine if he can still perform the work he has performed in the past; if he can, he is not disabled. *Id.* § 404.1520(a)(4)(iv). Finally, the ALJ determines whether, based on the claimant's RFC and his age, education, and work experience, the claimant can make an adjustment to other work; if he can, he is not disabled. *Id.* § 404.1520(a)(4)(v).

"The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citation omitted). Once the burden shifts, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Id.* (citation omitted). "[T]he Commissioner may rely on the testimony of a vocational expert to find that the claimant

possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Id.* (citation omitted).

Here, the ALJ determined that Cunningham successfully moved through the first four steps of the sequential evaluation process, but, based on the testimony of the VE, denied Cunningham's claim at the fifth step. We review the ALJ's decision regarding this fifth step.

## C. Credibility

Cunningham argues that the ALJ improperly discredited his testimony regarding fatigue, diarrhea, and balance problems. A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, we "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).

Here, the ALJ accepted that "[t]he record establishes the existence of medically determinable impairments that could reasonably be expected to produce symptoms alleged by Cunningham," yet discounted

the extent of the symptoms and limitations Cunningham alleged. (Tr. at 28.) With regards to Cunningham's fatigueability, the ALJ stated:

> Cunningham's statements regarding the minimal amount of activity that provokes extreme fatigueability is [sic] inconsistent with his daily activities as reported at the hearing and in the record. While fatigueability is a significant limiting factor, the evidence does not indicate that it renders Cunningham incapable or [sic] performing sedentary work activities. Cunningham has been treated in an emergency room environment on numerous occasions for complications arising from his diabetes, on many occasions he recovered without treatment or left against medical advice without adverse consequences. . . . Cunningham's daily activities, and statements of examining sources, do not suggest Cunningham's fatigueability precludes all work activities.

(*Id.* at 28-29.)

We find the ALJ's conclusions regarding Cunningham's problems with fatigue to be supported by substantial evidence, especially given the great deference we afford an ALJ's credibility determination. Although Cunningham testified at the hearing before the ALJ that he cannot use an exercise machine for more than two minutes, that his ankles roll when he walks, that he can cut only two rows of grass before having to take a break, and that he takes a nap every afternoon; and Dr. Berger, a physician who examined Cunningham at the agency's request, concluded that "the marked increased fatigueability associated with his underlying problem is going to interfere with most forms of gainful employment," Cunningham's testimony regarding his daily activities, his experience working for the Goodwill Store in 2002, and the opinion of his treating nephrologist, Dr. Thomas Knauss, are substantial evidence that he is capable of performing limited sedentary work. (*Id.* at 511.)

Cunningham testified before the ALJ that he cooked, loaded a dishwasher, could use a vacuum cleaner and sweep a floor, could make a bed, could write, and could read "fairly well" with his glasses. (*Id.* at 869.) *See* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will

consider include: (i) [y]our daily activities."). In addition, the record indicates that Cunningham spent several days working for the Goodwill Store in 2002, where he sorted donated items, transferred racks of clothing, assisted in emptying donation boxes, cleaned and rearranged shelves, assisted customers, and helped load trucks with goods. Goodwill evaluated his work and concluded that Cunningham was capable of completing an eight-hour work day without extra breaks or rest periods. Furthermore, Dr. Knauss concluded in 1998 that Cunningham was in a position to maintain full-time employment.

With regards to Cunningham's balance issues, the ALJ determined that "Cunningham could not work on unprotected heights and only very occasionally climb ramps or stairs." (Tr. at 31.) He also concluded that Cunningham could occasionally lift up to ten pounds, frequently lift up to five pounds, sit for six hours during an eight-hour workday, and stand and walk for two hours during an eight-hour workday. There is substantial evidence for such a conclusion. While Cunningham testified before the ALJ that he has problems with his legs becoming numb from sitting and becomes exhausted from standing, he also testified that he could carry five or ten pounds and perform house chores. Furthermore, Dr. Knauss concluded in 1999 that Cunningham could stand for one hour at a time, walk for three quarters of an hour at a time, bend with limited balance, and lift and carry twenty-five pounds intermittently. In 2001, Knauss noted that Cunningham could stand for one hour, walk for two blocks, and lift and carry less than twenty-five pounds intermittently. And, as noted above, Goodwill concluded in 2002 that Cunningham was capable of completing an eight-hour work day without extra breaks or rest periods. The ALJ, therefore, adequately accounted for Cunningham's balance problems in his decision, and substantial evidence supports his discounting Cunningham's credibility regarding the impact of his balance on his ability to work.

The ALJ's decision did not reference Cunningham's claimed problems with diarrhea, but the discussion of "Cunningham's statements concerning the intensity, duration and limiting effects of [his] symptoms," (*Id.* at 29), and consideration of the "effectiveness and adverse side effects of [Cunningham's] anti-rejection medication," (*Id.* at 28), are sufficiently specific to satisfy the relaxed standard this Court employs when evaluating an ALJ's credibility determination. Despite Cunningham's testimony before the ALJ that when his diarrhea becomes severe, "it's like I can go 10 times in an hour," Goodwill reported that Cunningham was capable of completing an eight-hour workday without extra breaks or rest periods, substantial evidence supporting the ALJ's conclusion that Cunningham was capable of performing a limited range of sedentary work. (*Id.* at 872.)

**D.      Security Camera Monitor and Document Preparer jobs**

Cunningham also argues that substantial evidence does not support the finding that he could perform either the document preparer or security camera monitor jobs and the finding that a significant number of these jobs exist in the economy. Because we find that more information is needed to determine whether substantial evidence supports the conclusion that these jobs exist in substantial numbers, we do not reach the question of whether Cunningham could perform the jobs.

There is no "magic number" that qualifies as "significant" for purposes of satisfying this prong of the disability inquiry. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Rather, the determination is a fact-specific inquiry, guided by common sense:

> We know that we cannot set forth one special number which is to be the boundary between a 'significant number' and an insignificant number of jobs. . . . A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of

- 14 -

travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Id.* Cunningham argues that the factors set out in *Hall* raise doubt as to whether the number of jobs identified in this case is significant. Specifically, Cunningham asserts that the VE's testimony here is not reliable. We find the current record insufficient to address Cunningham's claim.

The VE based his testimony on job descriptions contained in the Dictionary of Occupational Titles ("DOT"), a document published by the Department of Labor that was more than a decade old when the ALJ heard Cunningham's claim. While the Social Security Commissioner does take administrative notice of this document when determining if jobs exist in the national economy, 20 C.F.R. § 404.1566(d)(1), common sense dictates that when such descriptions appear obsolete, a more recent source of information should be consulted. The two relevant descriptions here—document preparer and security camera monitor—strike us as potentially vulnerable for this reason. Without more, however, we cannot adequately review whether these job descriptions were up-to-date and, thus, whether the VE's testimony was reliable.

According to the DOT, a document preparer,

Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material . . . . Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

United States Department of Labor, Dictionary of Occupational Titles (1991), *available at*

http://www.oalj.dol.gov (follow "DOT" hyperlink; then follow "Clerical and Sales Occupations: 245.362-010

to 272.357-018" hyperlink).

> And a security camera monitor (referred to as surveillance-system monitor),

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

United States Department of Labor, Dictionary of Occupational Titles (1991), *available at*

http://www.oalj.dol.gov (follow "DOT" hyperlink; then follow "Service Occupations:363.681-010 to 389.687-

018" hyperlink). In light of the fact that more current job descriptions were available at the time of the hearing

before the ALJ—the Department of Labor replaced the DOT with the Occupational Information Network

(O*NET), a database that is continually updated based on data collection efforts that began in 2001— and that

the two descriptions relied on by the VE are not found in O*NET, we conclude that the VE's dependence on

the DOT listings alone does not warrant a presumption of reliability. *E.g.*, O*NET Resource Center,

http://www.onetcenter.org/dataCollection.html (last visited Jan. 4, 2010). As such, we remand to the

Commissioner for consideration of whether the DOT listings, specifically the document preparer and security

camera monitor descriptions, were reliable in light of the economy as it existed at the time of the hearing

before the ALJ.

## III.  CONCLUSION

For the reasons set forth above, we **GRANT** Cunningham's motion for substitution of parties and

**REMAND** to the Commissioner for further consideration consistent with this opinion.

RYAN, Circuit Judge, dissenting.          Since I believe that there is substantial evidence in the record supporting the Commissioner of Social Security's finding that there were a sufficient number of security camera monitor jobs available to the claimant, I respectfully dissent.

Substantial evidence "is generally defined as such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999). "In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Even if there is substantial evidence in the record to support a different conclusion, the Commissioner's decision "must stand if the evidence could reasonably support the conclusion reached." Her, 203 F.3d at 390.

In my judgment, our role is to decide whether the record made at the administrative hearing contains evidence adequate to support the Administrative Law Judge's conclusion. See id. It is not within this reviewing court's proper authority to locate evidence it thinks ought to have been taken into account by a better informed, more thoroughly prepared expert witness, and to hold that the expert's failure to consider this court's more favored data effectively nullified the "reliability" of the expert's opinion, rendering the entire body of otherwise "substantial evidence" suddenly insubstantial.

Notwithstanding that the vocational expert might have relied upon different or more current job listings data, I believe the testimony of the vocational expert, as it is set out in the record, is relevant evidence that adequately supports the Administrative Law Judge's conclusion that there were a sufficient number of camera monitor jobs available to the claimant. Consequently, I would affirm the decision of the district court.

I respectfully dissent.