NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0500n.06

No. 16-2616

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MOHAMED AHMED MOKBEL-ALJAHMI, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| UNITED OMAHA LIFE INSURANCE COMPANY, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant, | ) | |
| | ) | |
| | ) | |

**FILED**
Aug 28, 2017
DEBORAH S. HUNT, Clerk

**BEFORE: SILER, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellee Mohamed Ahmed Mokbel-Aljahmi ("Aljahmi")[1] brought this ERISA action after Defendant-Appellant United of Omaha Life Insurance Company ("United") discontinued his long-term disability insurance benefits. United concluded that, despite his physical limitations, Aljahmi can perform sedentary work and earn a sufficient wage so as to not be "disabled" under the relevant policy definition. Reviewing United's decision de novo,[2] the district court found Aljahmi eligible for benefits. United appeals, and we **AFFIRM**.

## I. FACTS

The Group Long Term Disability Insurance Policy (the "Policy") at issue contains two definitions of "disabled." For the first two years after an injury, an insured is eligible for benefits

---

[1] Both parties refer to Plaintiff using only this last element of his name, so we do likewise.

[2] The parties agree that the policy calls for de novo review.

if he is unable to do either his former job or any other job that would pay him more than 80% of his former regular monthly earnings. After two years, the definition changes. If the insured is qualified for and able to perform any job that would pay him more than 60% of his former regular earnings, he is not "disabled."[3] The parties agree that the 60% threshold for Aljahmi is $1,467.44 per month.

The district court concisely summarized the underlying facts as follows:

> Aljahmi worked for L&W Engineering Company from August 31, 1998 until February 11, 2011[.] Aljahmi performed various duties in the operation of welding machinery. The job description indicates that the position requires light strength and may require significant standing, walking, pushing, and/or pulling.

---

[3] The Policy states:

**Disability and Disabled** means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

> (a)    prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

> (b)    unable to generate Current Earnings which exceed 80% of your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 24 months Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

. . . .

**Gainful Occupation** means an occupation, for which You are reasonably fitted by training, education or experience, is or can be expected to provide You with Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to work.

(R. 11-1, PID 81–82 (emphasis in original).)

Aljahmi participated in L&W Inc.'s ERISA qualified benefit plan. United issued the Group Long Term Disability Insurance Policy ("Policy") to L&W Inc. Under the Policy, United agreed to pay insured persons long-term disability benefits ("LTD") subject to the terms and conditions of the Policy. L&W Inc. self-insured a short-term disability ("STD") benefits program for eligible employees; it retained United to review claims under the Policy.

Aljahmi began experiencing neck and back pain in 2003. In 2011, he was involved in a motor vehicle accident ("MVA"). His pain became more severe because of the accident and he experienced increased back, left leg, and neck pain, along with right arm pain and numbness. Aljahmi's doctor recommended that Aljahmi take off work. He did but never returned. Aljahmi's last day of work was February 11, 2011. He received STD benefits for 26 weeks.

(R. 25, PID 1846.)

After the car accident, Aljahmi underwent several MRIs of his back and shoulders, as well as EMGs of his limbs. Aljahmi was subsequently treated by multiple doctors, each of whom found him substantially impaired. As the district court noted:

Aljahmi's treating neurologist for 12 years, Bassam Maaz, M.D. diagnosed Aljahmi with lumbar radiculopathy, lower back pain from degenerative changes and bulging discs, neck pain secondary to herniated discs C3-C4, C4-C5, shoulder rotator cuff syndrome and depression. Dr. Maaz found that Aljahmi could not perform sedentary or light work on a sustained basis, could not sit, stand, and/or walk for more than one hour each day, could only lift and carry up to five pounds occasionally, required complete freedom to rest frequently without restriction . . . .

Dr. Mahmoud Rahim, M.D.[,] Aljahmi's treating internist . . . found that Aljahmi could not perform sedentary or light work on a sustained basis, could sit, stand, and/or walk for less than one hour each day, could not lift up to five pounds on a regular and sustained basis, could not use his hands on a regular and sustained basis, required complete freedom to rest frequently without restriction, and would need to elevate his lower extremities 3-4 hours a day.

Aljahmi's treating orthopedic specialist, Jiab Suleiman, M.D., limited Aljahmi to three hours of sitting and one hour of standing and walking, with restrictions on lifting/carrying, bending, squatting, crawling, climbing, and reaching above the shoulder level . . . .

(R. 25, PID 1847–49 (record citations omitted).) United did not challenge Aljahmi's doctors' opinions, and paid Aljhami disability benefits from 2011 to 2013.

In 2013, the second, more limited definition of "disability" became effective, and United reconsidered Aljahmi's eligibility for benefits. Julie Grancer, a United nurse, reviewed Aljahmi's medical records in July 2013, but did not examine him. Grancer did not dispute Aljahmi's doctors' diagnoses, but opined that Aljahmi was precluded only from work that involved "constant neck motion in flexion, extension and rotation, frequent overhead reaching, crawling and climbing, repetitive motion of the right shoulder, repetitive bending/twisting and lifting/carrying [greater than] 20 pounds." (R. 11-5, PID 699.)

United also had a Transferable Skills Assessment ("TSA") performed by Douglas Palmer of Palmer Vocational Services. Palmer did not interview Aljahmi, and United did not provide Palmer with Aljahmi's medical records or his doctors' opinions regarding work restrictions. Instead, Palmer relied on Nurse Grancer's conclusions and Aljahmi's Education, Training and Work Experience form ("ETE"). In his ETE, completed in April 2013, Aljahmi reported that prior to his time at L&W, he had worked as a machine operator from 1997 to 1998 and as a cafeteria worker from 1994 to 1996. Aljahmi also reported that he was a high school graduate without any additional education, no skills other than welding and stamping, and that the only language he spoke fluently was Arabic. Based on this information, Palmer concluded Aljahmi could perform several different jobs and earn up to $1,696.70 per month.

United discontinued Aljahmi's benefits on August 27, 2013. Aljahmi initiated an administrative appeal, arguing that United had improperly ignored the diagnoses and conclusions of Aljahmi's treating physicians and that, even accepting Nurse Grancer's conclusions, Aljahmi would still be unable to work in any of the jobs identified by Palmer.

In response, United scheduled Aljahmi for an April 23, 2014 Independent Medical Evaluation ("IME") with Joseph Salama, M.D. The appointment did not take place then,

however, because of confusion regarding the location. In the meantime, United had arranged for covert surveillance of Aljahmi from April 22-24, 2014. On April 22, Aljahmi was seen leaving his house once, walking with a cane. He drove himself to a convenience store and returned home within an hour. On April 23, Aljahmi left his house only once, riding as a passenger to the erroneously scheduled IME appointment, walking with a cane, and wearing wrist braces. On April 24, Aljahmi did not leave his house.

The rescheduled IME took place in May. Dr. Salama reviewed Aljahmi's medical records and examined him. Dr. Salama confirmed that Aljahmi was suffering from a radiculopathy and chronic pain. Further, Dr. Salama agreed with the restrictions imposed by Aljahmi's treating physicians, except that Dr. Salama recommended a 10-pound lifting restriction instead of a 5-pound restriction. However, Dr. Salama also opined—without explanation—that Aljahmi could return to his work as a welder, a job that required him to lift up to 40 pounds at a time.

On June 12, 2014, United telephoned Aljahmi's attorney and "indicated that the IME . . . was not conclusive." (R. 11-1, PID 99.) United therefore sought to have Aljahmi undergo a Functional Capacity Evaluation ("FCE"), apparently with a physical therapist. Aljahmi's attorney responded by letter. Counsel acknowledged that the Policy required Aljahmi to submit to an FCE conducted by a physician or a vocational rehabilitation expert, but objected to an FCE conducted by a physical therapist. Counsel further contended that "no further examinations are warranted in light of Dr. Salama's IME report and the treating doctor[s'] opinions." (R. 11-3, PID 432.) United never responded to counsel's letter or otherwise pursued the matter.

Instead, on July 18, 2014, United issued a new determination letter overturning its August 2013 decision and reinstating Aljahmi's benefits. According to United's internal records, Dr.

Salama's endorsement of a 10-pound limit on lifting and other severe restrictions was the basis for the reversal and benefits award.

Despite this determination, United continued to investigate Aljahmi's eligibility for benefits. On August 5, 2014, United sent Aljahmi a letter asking for information about his claim for Social Security disability benefits ("SSDI"). Aljahmi's counsel responded that Aljahmi's SSDI claim was pending with the agency's Appeals Council.

United then commissioned Patricia Thal of University Disability Consortium ("UDC") to provide a new TSA based on Dr. Salama's report, which she did in November 2014. Thal did not interview Aljahmi. But based on Aljahmi's work history, she concluded he had a range of skills, including "[u]nderstanding written sentences and paragraphs in work[-]related documents." (R. 11-3, PID 391.) With that in mind, Thal opined that Aljahmi could work several light-duty or sedentary jobs with varying earning potential: (1) Gate Guard/Security Reception (light; $1,452.60/month); (2) Surveillance-System Monitor (sedentary; $1,925.83/month); (3) Cashier, e.g., parking garage (light; $1,379.17/month); (4) Small Product Assembler (light; $1,677.50/month); (5) Assembler, Semi-Conductor (sedentary; $1,504.17/month); or (6) Solderer (light; $1,504.17/month).[4]

Also in November, in response to a request from United, Dr. Rahim stated that Aljahmi was permanently and totally disabled, and provided updated treatment notes. More specifically, Dr. Rahim noted that in an eight-hour workday, Aljahmi could sit no more than two hours, stand no more than one hour, and walk no more than one hour. Dr. Maaz also provided updated notes,

---

[4] All capitalized job titles are terms of art drawn from the Department of Labor's Dictionary of Occupational Titles, its online successor, O*NET, or similar sources. *See* GovtUSA, *Dictionary of Occupational Titles (DOT) Job Descriptions*, http://govtusa.com/dot/ (last visited August 6, 2017); *see generally Cunningham v. Astrue*, 360 F. App'x 606, 615–16 (6th Cir. 2010).

and United also requested and received Aljahmi's updated prescription history. In January 2015, United requested an update on the status of Aljahmi's SSDI claim. There is no indication Aljahmi responded to this letter.

United denied further benefits on March 23, 2015. The determination letter recites Aljahmi's medical history, including the information received since the prior determination. Citing Thal's November 2014 TSA, United concluded that Aljahmi had the transferable skills necessary to earn at least $1,467.44 per month. As examples of the jobs that would fit within Aljahmi's work restrictions, United cited the six jobs listed in Thal's November 2014 TSA. Aljahmi pursued an administrative appeal.

In support of his appeal, Aljahmi provided an updated assessment from Dr. Maaz, who opined that Aljahmi's condition had worsened since 2012, and that Aljahmi remained incapable of both light and sedentary work. Aljahmi also provided a Vocational Rehabilitation Analysis prepared by James Fuller of Fuller Rehabilitation, who met with Aljahmi. Fuller reported that Aljahmi was educated entirely in Arabic and that the administration of multiple Wide Range Achievement Tests ("WRATs")[5] demonstrated that Aljahmi was functionally illiterate in English. Fuller also reported that Aljahmi's functional capacity was severely limited by his pain, and further by the side effects of his pain medications. Fuller opined that because Aljahmi had only unskilled employment in his work history, he had no transferrable skills and was unemployable.

Aljahmi also submitted an excerpt from the transcript of vocational expert Scott Silver's testimony in an unrelated case before a Social Security Administration administrative law judge,

---

[5] This court has long recognized the WRAT as a valid measure of literacy in the context of a vocational analysis. *See, e.g.*, *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 450 (6th Cir. 1990).

in which Silver opined that the traditional "surveillance monitor" or "systems monitor" job that required little skill or physical ability no longer exists. According to Silver, such jobs are now government jobs or casino security jobs, both of which require additional skills, including the ability to apprehend suspects.

United responded to Aljahmi's new evidence by retaining UDC's James Lambur, M.D., to review Aljahmi's medical records. Dr. Lambur reviewed the diagnostic test records from 2011 to 2013, Aljahmi's prescription list from 2008 to 2011, Thal's November 2014 TSA, and clinical notes from Drs. Maaz (Feb. 15, 2011 to Sept. 11, 2014), Rahim (Aug. 22, 2012 to Jan. 6, 2015), and Suleiman (Sept. 21, 2011 to Apr. 24, 2013). However, Dr. Lambur did not review Dr. Maaz's April 2015 assessment or notes, Dr. Rahim's December 2014 assessment, Fuller's vocational analysis, which included personal observations of Aljahmi, or the 2014 surveillance video, which would have allowed Dr. Lambur to observe Aljahmi, even if only indirectly. Similarly, there is no indication Dr. Lambur reviewed Dr. Salama's IME report, or Aljahmi's prescription records for 2011 to 2015. Based on the information he *did* review, Dr. Lambur's June 4, 2015 report concludes that "[t]here is no documented consistent clinical or radiographic evidence to support ongoing complaints provided by Mr. Aljahmi." (R. 11-1, PID 153.) In summarizing his findings, Dr. Lambur wrote:

> [T]here is no consistent evidence presented of notable neurological muscular or functional deficit recorded. Electromyographic studies have presented evidence of mild bilateral carpel tunnel syndrome as well as some evidence of some mild lumbar radiculopathy. None of these findings are of a severe nature and it is the conclusion of this reviewer that Mr. Aljahmi has shown no need to ambulate with the aid of external accoutrements such as a cane and is well able to engage at the sedentary level of activity.

(*Id.* at 152.)

United also commissioned a second TSA from Thal, which she delivered on June 5, 2015. For the new TSA, Thal did not review any medical records, and did not have access to Dr. Lambur's report. Instead, Thal was told to assume that Aljahmi was "[a]ble to perform sedentary and light strength demands [sic] occupations," was "[r]estricted from lifting greater than 20 pounds," and "[s]hould not bend, twist, or squat more than five times per hour." (R. 11-1, PID 140–41.) Thal reviewed Fuller's report, but did not acknowledge the WRAT results and continued to conclude that Aljahmi was able to read and understand work-related documents. This time, Thal opined that Aljahmi could perform eight different jobs: (1) Gate Guard/Security Reception (light; $1,492.50/month); (2) Cashier (light; $1,375.17/month); (3) Small Product Assembler (light; $1,697.50/month); (4) Cafeteria Attendant (light; $1,455.00/month); (5) Parking Lot Attendant (light; $1,390.00/month); (6) In-Store Greeter ($1,350.83/month); (7) Surveillance-System Monitor (sedentary; $1,774.17/month); (8) Assembler, Semi-Conductor (sedentary; $1,410.00/month).[6] There is no indication Thal was provided with or considered Silver's testimony regarding the Surveillance-System Monitor job.

On June 8, 2015, United denied Aljahmi's appeal. The benefits-determination letter states that United considered all of Aljahmi's medical records (including those submitted in support of his appeal), the 2013 Palmer TSA, the 2014 and 2015 Thal TSAs, Fuller's report, Dr. Salama's IME report, and Dr. Lambur's report. The denial letter relies primarily on Dr. Lambur's conclusion that Aljahmi is capable of performing sedentary work. Based on that, and Thal's November 2014 TSA (not the June 2015 TSA), the denial letter concludes that Aljahmi is capable of earning $1,504.17 per month as an Assembler, Semi-Conductor, or $1,925.83 per

---

[6] The expected earnings for each job changed from the November 2014 TSA to the June 2015 TSA because the June 2015 TSA used more recent wage data.

month as a Surveillance-System Monitor. The denial letter does not acknowledge that, using the more recent data from the June 2015 TSA, Aljahmi could only expect to earn $1,410.00 per month as an Assembler, Semi-Conductor—less than his eligibility threshold of $1,467.44 per month. The denial letter explains that "[t]he medical evidence supports restrictions and limitations through March 23, 2015," but "[o]ur review of the file does not find support for restrictions and limitations which would prevent Mr. Mokbel-Aljahmi from performing the material duties of a sedentary strength demand occupation" thereafter. (R. 11-1, PID 136.)

Aljahmi filed the instant complaint on July 16, 2015. Upon a de novo review of the administrative record, the district court criticized Thal's TSAs because they relied on United's view of Aljahmi's limitations, rather than "the limitations set forth by Aljahmi's treating doctors." (R. 25, PID 1846–57.) The district court was also skeptical of Thal's TSAs and Dr. Lambur's report because another court had found their employer, UDC, "to be biased and unreliable." (*Id.* (citing *Velikanov v. Union Sec. Ins. Co.*, 626 F. Supp. 2d 1039, 1051–52 (C.D. Cal. 2009).) Further, the district court criticized United for relying primarily on Dr. Lambur, who had not examined or treated Aljahmi, and for failing to give adequate weight to the "ample evidence of disability" found in the "examinations and findings" of Aljahmi's treating doctors. (*Id.* at 1857–58.) The district court also noted that even Dr. Lambur limited Aljahmi to sedentary work, and that only two of the potential jobs identified by Thal—Surveillance-System Montior and Assembler, Semi-Conductor—are sedentary jobs. The district court accepted Aljahmi's contention, supported by Silver's Social Security Administration testimony, that "the surveillance-system monitor job no longer exists," and that the jobs that replaced it "usually involve more than sedentary work." (*Id.*) The district court concluded "that Aljahmi is entitled to benefits." (*Id.*) The district court did not address the Assembler, Semi-Conductor job,

presumably recognizing that the expected wages for that job as stated in Thal's June 2015 TSA fall below Aljahmi's eligibility threshold of $1,467.44 per month.

After the district court's decision, the parties stipulated to the amount of damages and to final judgment. This timely appeal followed.

## II. DISCUSSION

In an ERISA denial-of-benefits suit, the plaintiff "must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined" by the Policy. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014).

United's benefits determination was subject to de novo review by the district court, because the Policy does not "give[] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the" Policy. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The district court's review was properly "based solely upon the administrative record." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006) (quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).[7] "This Court reviews the district court's decisions on matters of law in an ERISA benefits action *de novo* and its factual findings for clear error." *Moore*, 458 F.3d at 438 (citation omitted). We reverse for clear error only when we are "left with the definite and firm conviction that a mistake has been committed." *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

[7] Although this is an ERISA case to be decided on the administrative record, the district court recited the Rule 56 summary judgment standard, and did not explicitly "render findings of fact and conclusions of law" based on the administrative record. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006); *see generally Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617–19 (6th Cir. 1998) (explaining that suits pursuant to 29 U.S.C. § 1132(a)(1)(B) are procedurally unique, and neither Rule 56 (summary judgment) or Rule 52 (bench trials) applies). This oversight is inconsequential, however, as the district court's findings and reasoning are sufficiently clear to allow for appellate review.

A.    The Medical Evidence

As the district court recognized, "Aljahmi submitted medical evidence from numerous doctors who directly treated him for years and consistently concluded that he was unable to work." (R. 25, PID 1859.) Although it was not required to defer to Aljahmi's treating physicians' opinions, *see Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010), the district court found their conclusions to be reliable. United contends this was clear error. We disagree.

1.    *Dr. Maaz – Aljahmi's Neurologist*

United attacks Dr. Maaz's conclusions on two grounds. First, United points out that there are no intervening treatment notes or test results to explain why Dr. Maaz thought in August 2011 that Aljahmi would eventually be able to return to work, but concluded otherwise in May 2012. But a missing record or a change of mind in 2012 does little to undermine the credibility of Dr. Maaz's conclusions about Aljahmi's limitations in 2015, especially because Dr. Maaz treated Aljahmi regularly through 2014 and provided an updated assessment in April 2015.

Second, United points out that several electronic notes prepared by Dr. Maaz in 2014 and 2015 are virtually identical, and that the "Neuro" and "Musculoskeletal" sections of those notes report no symptoms. The sections detailing Aljahmi's complaints, however, report that Aljahmi "has severe back pain," "favors one leg due to pain," and that Aljahmi's pain "interferes with the activities of daily living." (*E.g.*, R. 11-2, PID 253.) Further, the "Assessment" sections report "[s]evere back and neck pain," "[r]ight cervical radiculopathy," "bilateral shoulder pain," and "left lumbar radiculopathy." (*Id.* at 255.) Thus, the district court quite reasonably concluded that the inconsistencies in Dr. Maaz's notes are minor, and do not undermine his conclusions.

       *2.*       *Dr. Suleiman – Aljahmi's Orthopedic Surgeon*

United criticizes the district court for not addressing three points regarding Dr. Suleiman. None of these criticisms is persuasive. First, although Dr. Suleiman did note in 2013 that Aljahmi's condition might eventually improve, that does not undermine the conclusion of others that Aljahmi was still substantially impaired in 2015. Second, it is true that Aljahmi did not consult Dr. Suleiman or any other orthopedic surgeon after 2013. But Dr. Salama, who conducted the 2014 IME for United, is also an orthopedic surgeon, and he found Aljahmi to be substantially impaired. Further, under the Policy, when United reconsidered Aljahmi's claim in 2015, it could have required Aljahmi to be examined again by Dr. Salama, or by a different orthopedic surgeon of its choice, but did not do so. Third, United is correct that Dr. Maaz recommended 30 minutes or less each of walking, sitting, or standing per workday for Aljahmi in 2012, whereas Dr. Suleiman capped workday sitting time at three hours and workday standing and walking time at one hour each in 2012 and 2013. This relatively minor difference of opinion notwithstanding, United approved Aljahmi for benefits in July 2014 despite the supposed conflict.

       *3.*       *Dr. Rahim – Aljahmi's Primary Care Doctor*

United contends that Dr. Rahim's conclusions are unreliable because his electronic notes are sometimes repetitive and sometimes internally inconsistent. This argument is no more persuasive as to Dr. Rahim than as to Dr. Maaz. Dr. Rahim consistently prescribed Aljahmi pain medication such as hydrocodone and high-dose ibuprofen. Additionally, in 2012 and again in 2014, Dr. Rahim completed United's evaluation forms and certified that Aljahmi was unable to perform either sedentary or light work. Thus, whatever information did or did not make it into his electronic notes, Dr. Rahim clearly was of the opinion that Aljahmi was suffering from

serious chronic pain and was unable to work. The district court was not obliged to reject his conclusions as unreliable.

### 4. Dr. Salama – United's IME Doctor

Dr. Salama's findings generally support the district court's conclusion. As United acknowledges, Dr. Salama concluded that Aljahmi suffered from radiculopathy, needed ongoing medication and treatment for pain, and could work only with significant restrictions. United also acknowledges that it found Aljahmi eligible for benefits in July 2014 *after* receiving Dr. Salama's report. United argues, however, that "[e]vidence in an ongoing ERISA case is cumulative," and therefore Dr. Salama's findings are not dispositive. (Appellant's Br. at 52) This is true. But it does not change the fact that the doctor United hired to examine Aljahmi concluded that Aljahmi was significantly impaired, and agreed with the work restrictions recommended by Aljahmi's treating doctors, except for the relatively minor difference that he concluded Aljahmi could lift up to 10 pounds, rather than up to 5 pounds.

### 5. Dr. Lambur – United's Record-Review Doctor

Finally, United contends that the district court improperly discounted Dr. Lambur's opinion. The district court regarded Dr. Lambur's opinion "with skepticism," observing that another district court had found Dr. Lambur's employer, UDC, "to be biased and unreliable." (R. 25, PID 1857 (citing *Velikanov*, 626 F. Supp. 2d at 1051–52).)[8] However, immediately after this observation the court stated, "[b]ut this is not dispositive," and went on to discuss various deficiencies in Dr. Lambur's and Thal's opinions, prefacing the discussion with "[m]ore importantly." (*Id.*) Thus, any error in the district court's consideration of *Velikanov* is harmless.

---

[8] The *Velikanov* court, writing in 2009, criticized UDC for advertising that "its services will probably result in '[i]mproved denial and closure rates and reduced costs.'" 626 F. Supp. 2d at 1051 (record citation omitted).

The additional reasons identified by the district court support its finding that Dr. Lambur's opinion was unreliable. First, Dr. Lambur did not examine Aljahmi. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) ("A plan administrator's decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan.") (citation omitted). Second, although Dr. Lambur stated that "magnification," "exaggeration," or attempts at "secondary gain *must be considered*," he acknowledged that there was *no evidence* of "symptom magnification or exaggeration." (R. 11-1, PID 154 (emphasis added)); *see Judge*, 710 F.3d at 663 ("This court has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her.") (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008)).

Third, and most importantly, Dr. Lambur did not consider all of the available medical evidence. He did not review Dr. Maaz's April 2015 assessment or notes, Dr. Rahim's December 2014 assessment, Dr. Salama's IME report, Aljahmi's prescription records for 2011 to 2015, Fuller's report of his personal observations of Aljahmi, or the 2014 surveillance video. A record review that does not include all relevant records is unreliable and "clearly inadequate." *See Calvert*, 409 F.3d at 296. The omission of so much relevant information suggests that United impermissibly "'cherry-picked' [its] file in hopes of obtaining a favorable report" from Dr. Lambur. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (finding that the omission of one physician's report from the materials sent to a vocational consultant for review rendered the subsequent benefits determination arbitrary and capricious).

In sum, Dr. Lambur's opinion does not undermine the conclusions of the doctors who actually examined and treated Aljahmi. *See Black & Decker Disability Plan v. Nord*, 538 U.S.

822, 834 (2003). The district court did not err, clearly or otherwise, by accepting the conclusions of Drs. Maaz, Suleiman, and Rahim regarding the extent of Aljahmi's impairment.

### B.     The Vocational Evidence

In light of the consistency among the reliable medical opinions, determining whether Aljahmi is able to meet the earnings threshold is straightforward. "[S]edentary work will generally involve sitting for six hours out of an eight hour work day," *Wages v. Sec'y of Health & Human Servs.*, 755 F.2d 495, 498 (6th Cir. 1985) (per curiam). At best, Aljahmi is restricted to sitting a maximum of three hours per eight-hour workday, and also must be able to rest frequently without restriction and elevate his legs for several hours each day. He is therefore incapable of even sedentary work. *See Wages*, 755 F.2d at 497–99; *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[O]ne does sedentary work sitting[,] but not lying down, and no employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time.") (citation and quotation marks omitted).

Further, even if we credit Dr. Lambur's conclusion that Aljahmi is capable of sedentary work, Aljahmi is still entitled to benefits. United's decision to deny benefits in 2015 was based on Thal's determination that Aljahmi was able to work as a Surveillance-System Monitor or Assembler, Semi-Conductor. And Thal's conclusion was based, in part, on Aljahmi's supposed ability to read and understand work-related documents. But Fuller, the only vocational expert to meet with Aljahmi, found him to be functionally illiterate in English. In light of this evidence, Thal's conclusions are not credible.

Finally, even disregarding Fuller's report, the district court's conclusion that Aljahmi was not able to earn $1,467.44 per month was not clear error. United's June 2015 benefits decision relied on Thal's November 2014 TSA to conclude that the expected wages for the Assembler,

Semi-Conductor job were $1,504.17 per month. However, Thal's June 2015 TSA reported that the expected wages for that job had fallen to $1,410.00 per month. Whether this reliance on outdated information was intentional or inadvertent, Aljahmi's supposed ability to assemble semiconductors cannot be the basis for denying him benefits.

That leaves only the Surveillance-System Monitor job. Consistent with Silver's testimony, the district court determined that the Surveillance-System Monitor job description, which dates to the 1991 edition of the Dictionary of Occupational Titles, is obsolete. *See Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010) (reaching the same conclusion). Further, no such job description exists in O*NET, the online database that replaced the Dictionary of Occupational Titles in 2001. *Id.* Critically, United did not provide the Silver testimony or the O*NET documents and letters from Aljahmi addressing the Surveillance-System Monitor job to Thal. Again, United may not "cherry-pick[]" from its file "in hopes of obtaining a favorable report." *Spangler*, 313 F.3d at 362. In light of *Cunningham* and United's failure to provide Thal with all the relevant evidence, it was not clear error for the district court to disregard Thal's conclusions.

C.      United's Remaining Arguments

1.      *The Functional Capacity Evaluation*

United is correct that Aljahmi objected to its request that he undergo an FCE in June 2014, and that "[a] functional capacity evaluation is generally a reliable and objective method of gauging the extent one can complete work-related tasks." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (quotation marks and citations omitted). But that is irrelevant here, not least because United did not pursue its request. Indeed, United granted Aljahmi's first appeal in June 2014, just one month after he objected to the FCE. When United

revisited Aljahmi's claim in 2015, it did not ask Aljahmi to undergo an FCE, did not rely on the absence of an FCE in denying benefits, and stated that its final decision was based on "a full and fair review" of Aljahmi's appeal. (*See* R. 11-1, PID 133–37.) Nothing about Aljahmi's objection to an FCE suggests that the district court erred in finding him disabled.

2.      *The Social Security Issue*

The Social Security Administration denied Aljahmi's SSDI claim, and Aljahmi's appeal is currently pending in the United States District Court for the Eastern District of Michigan. United contends that this casts doubt on Aljahmi's claim here and criticizes the district court for not addressing the Social Security issue. *See Calvert*, 409 F.3d at 294 (an "SSA determination, though certainly not binding, is far from meaningless"). This argument is not persuasive.

First, "a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria," *Whitaker v. Hartford Life & Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005), and United makes no effort to explain whether or how the Policy's eligibility requirements track SSDI eligibility requirements. Second, when Aljahmi sought to rely on documents from his Social Security proceedings to buttress his arguments below, United successfully argued that those documents should be stricken because the district court was required to base its decision "solely upon the administrative record." *Moore*, 458 F.3d at 430 (quoting *Wilkins*, 150 F.3d at 619).

3.      *Aljahmi's Ability to Drive*

United points out that the investigator hired to surveil Aljahmi in April 2014 saw him drive once, and that Aljahmi acknowledged to Fuller in 2015 that he was able to drive a little bit, if necessary. Although perhaps relevant to evaluating the extent of Aljahmi's impairment, the ability to drive has no particular significance under the Policy. Indeed, United found Aljahmi

eligible for benefits in July 2014, *after* Aljahmi was seen driving. That Aljahmi can drive if he has to does not negate the medical and vocational evidence in his favor.

### 4. The Lack of Recent Diagnostic Tests

Finally, United argues that Aljahmi has not shown he was disabled as of 2015 because the diagnostic tests supporting his claim were all conducted in 2013 or earlier, and the key tests were conducted in 2011. This argument has some intuitive appeal, but is ultimately unpersuasive. Dr. Salama noted in his June 2014 IME report that Aljahmi's diagnostic tests were not current. (R. 11-4, PID 499 ("I am unable to determine if the restrictions are permanent without updated imaging studies and an updated EMG.").) Nevertheless, United found Aljahmi to be disabled in July 2014. Further, United never asked for new tests, and did not rely on the absence of current test results in terminating Aljahmi's benefits. Updated tests might have been useful, but their absence does not undermine the evidence in Aljahmi's favor, much less indicate clear error by the district court.

### III. CONCLUSION

In sum, the district court did not clearly err in accepting the opinions of Aljahmi's treating doctors as to Aljahmi's physical limitations. Nor did it clearly err, given those doctors' conclusions and the reliable vocational evidence, in concluding that Aljahmi was not capable of meeting the Policy's earnings threshold, and thus was entitled to long-term disability benefits. We therefore **AFFIRM** the judgment of the district court.